1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9   Robert Henry Moormann,              )   No. CV-91-1121-PHX-ROS
                                        )
10            Petitioner,                )   DEATH PENALTY CASE
                                        )
11  v.                                   )
                                        )   **ORDER**
12  Dora B. Schriro, et al.,             )
                                        )
13            Respondents.               )
                                        )
14  _____ )
                                        )
15

16        Robert Henry Moormann (Petitioner) is a state prisoner under sentence of death.  In

17  April 2000, this Court denied his request for habeas corpus relief under 28 U.S.C. § 2254.[1]

18  The matter is now before this Court following a remand from the Ninth Circuit Court of

19  Appeals.  *Moormann v. Schriro*, 426 F.3d 1044 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 2984

20  (2006).  For the reasons set forth herein, the Court finds that Petitioner is not entitled to

21  habeas relief.

22                              **BACKGROUND**

23        On January 12, 1984, Petitioner, an inmate at the Arizona State Prison in Florence

24  serving a sentence of nine years to life for kidnapping, was released to his 74-year-old

25  adoptive mother for a three-day furlough.  At some point after they checked into a motel near

26

27        [1]      Because Petitioner filed his initial petition for habeas corpus relief prior to the
28  effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), this matter is
    governed by pre-AEDPA law.  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

1    the prison, Petitioner suffocated her and dismembered her body.  He put the body parts in

2    numerous trash bags and placed the bags in various dumpsters around town.

3           At trial, Petitioner admitted killing his mother but claimed he was not guilty by reason

4    of insanity.  On April 4, 1985, a jury rejected the insanity defense and convicted Petitioner

5    of first-degree murder.  The trial court sentenced him to death.  On direct appeal, the Arizona

6    Supreme Court affirmed.  *See State v. Moorman*, 154 Ariz. 578, 744 P.2d 679 (1987).[2]

7           In May 1988, Petitioner filed *pro se* a petition for state post-conviction relief (PCR).

8    The superior court appointed counsel, who filed an amended petition and a second amended

9    petition.  The court denied the petition on procedural grounds and denied a motion for

10    rehearing.  Petitioner did not file a petition for review with the Arizona Supreme Court.

11           In January 1991, Petitioner filed *pro se* a second PCR petition.  New counsel was

12    appointed, and the petition supplemented.  The superior court dismissed the petition on

13    procedural grounds and denied a motion for rehearing.  The Arizona Supreme Court denied

14    review.

15           In July 1991, Petitioner filed a preliminary petition for habeas corpus relief in this

16    Court.  (Dkt. 1.)[3]  A second amended petition filed in September 1996 raised thirty claims.

17    (Dkt. 118.)  In orders dated July 3, 1997, January 12, 1998, and April 5, 2000, the Court

18    determined that Petitioner's claims were either procedurally defaulted or meritless.  (Dkts.

19    139, 158, 184.)

20           In July 2006, the Ninth Circuit Court of Appeals remanded this matter for a

21    determination of whether the failure of Petitioner's appellate counsel to raise certain claims

22    on appeal excuses the default of those claims.  *Moormann*, 426 F.3d at 1059-60.  If so, this

23    Court is to consider the merits of the defaulted claims.  Pursuant to this Court's order, the

24

25          [2]    Petitioner's last name is spelled variously as "Moorman" and "Moormann" in

26    the state court record.

27          [3]    "Dkt." refers to documents in this Court's file.

28    

1    parties filed supplemental briefs.  (Dkts. 198, 199, 200.)

2                                    **DISCUSSION**

3           In his post-remand brief, Petitioner asserts there is cause and prejudice to excuse the

4    procedural default of the following claims:

5           I.      Trial counsel erred in not presenting alternative defenses of impulse,
                    accident, and abuse, and failed to request a lesser-included-offense
6                   instruction for second-degree murder (denominated as Claim 12-B in
                    the Court's July 3, 1997 order addressing procedural bar issues);

7           II.     The trial court erred when it denied the defense an opportunity to rebut
8                   the state's evidence regarding insanity and to give the final closing
                    argument (denominated by the Court as Claim 8); and

9           III.    Sentencing counsel failed to locate records and interview and present
10                  witnesses regarding Petitioner's social history, including evidence of
                    physical and mental impairments, and failed to mitigate Petitioner's
11                  prior conviction (denominated by the Court as Claims 16-A, 16-B, 16-
                    C, and 16-H).

12   (Dkt. 198 at 5, 24, 31; *see also* Dkt. 139 at 13, 16, 21-22.)

13          Because the doctrine of procedural default is based on comity, not jurisdiction, federal

14   courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

15   468 U.S. 1, 9 (1984).  As a general matter, a procedurally defaulted claim will not be

16   reviewed on the merits unless a petitioner demonstrates legitimate cause for the failure to

17   properly exhaust the claim in state court and prejudice from the alleged constitutional

18   violation. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "Cause" exists if a petitioner

19   demonstrates that "some objective factor external to the defense impeded counsel's efforts

20   to comply with the State's procedural rule." *Id.* at 753.  Constitutionally ineffective

21   assistance of counsel is such a factor. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To

22   establish prejudice, a habeas petitioner bears the burden of demonstrating "not merely that

23   the errors at his trial constituted a possibility of prejudice, but that they worked to his actual

24   and substantial disadvantage, infecting his entire trial with errors of constitutional

25   dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

26          As cause for the default of his claims, Petitioner asserts that appellate counsel's

27

28                                          - 3 -

representation was constitutionally ineffective because he failed to raise the claims on appeal.[4]  The Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of counsel on his first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985).  A claim of ineffective assistance of counsel (IAC) on appeal is reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984); that is, whether counsel's performance was deficient and whether such performance resulted in prejudice.  *See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989).  To establish appellate IAC, a petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal.  *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).  Because assessment of prejudice in the context of appellate IAC necessarily requires an evaluation of the merits of the underlying claim, the Court addresses the merits of Petitioner's claims to determine whether appellate counsel's failure to raise each on direct appeal excuses Petitioner's failure to properly exhaust the claim in state court.  *Hain v. Gibson,* 287 F.3d 1224, 1231 (10th Cir. 2002) (stating that a court looks to the merits of an omitted issue to determine if appellate counsel provided ineffective assistance by failing to raise issue on appeal).

## I.   Ineffective Assistance of Counsel at Trial

In remanding this case, the Ninth Circuit directed this Court to assess whether

---

[4]     Petitioner also asserts appellate counsel ineffectiveness as cause for the default of a claim alleging trial court error in not providing Petitioner a jury trial on the factors that rendered him death-eligible.  (Dkt. 198 at 33.)  He concedes, however, that he cannot demonstrate prejudice from counsel's failure to raise the claim on appeal (*id.*).  *See, e.g.*, *State v. Jordan*, 137 Ariz. 504, 506, 672 P.2d 169, 171 (1983) (reaffirming no right to jury findings for aggravating factors).  Moreover, even if Petitioner overcame the default of this claim, relief is foreclosed by *Schriro v. Summerlin*, 542 U.S. 348 (2004), in which the Court held that its decision *Ring v. Arizona*, 536 U.S. 584 (2002) (holding that the Sixth Amendment requires jury findings on aggravating factors), does not apply retroactively.

appellate counsel's failure to raise "those claims that were presented in [Petitioner's] first and second PCR" resulted in prejudice. *Moormann*, 426 F.3d at 1059. In his brief following remand, Petitioner asserts that included in the Ninth Circuit's directive are IAC claims based on trial counsel's failure to (1) present alternative defenses of impulse, accident, and abuse, and (2) request a lesser-included offense instruction on second degree murder. (Dkt. 198 at 5.) These two allegations were generally presented in Petitioner's PCR proceedings and, therefore, will be addressed below. (Dkt. 61, Ex. KK at 21-22, Ex. W at 8.) However, within the body of Petitioner's argument on these claims, he has attempted to resurrect other allegations of ineffectiveness that were not presented in state court and whose procedural default was affirmed by the circuit court. *See Moormann*, 426 F.3d at 1055-56. Specifically, Petitioner criticizes trial counsel's presentation of the insanity defense, including his choice of expert; his alleged failure to provide this expert with necessary background information; and his alleged failure to investigate psychiatric medications. (Dkt. 198 at 7-8, 10-12, 22; Dkt. 200 at 7-9, 18-19.) Because these allegations were not presented in Petitioner's first or second PCR proceedings (*see* Dkt. 61, Exs. KK, W) and this Court's dismissal of the claims as procedurally barred has been upheld by the Ninth Circuit, *Moormann*, 426 F.3d at 1055-56, further assessment of counsel's representation with respect to the insanity defense is not appropriate. *See United States v. Thrasher*, 483 F.3d 977, 981-82 (9th Cir. 2007) (explaining the "rule of mandate" doctrine), *cert. denied,* 128 S. Ct. 2052 (2008).

At the time of Petitioner's direct appeal in 1986, Arizona's high court had adopted *Strickland*'s two-prong test as the standard for determining counsel's effectiveness. *State v. Nash*, 143 Ariz. 392, 397, 694 P.2d 222, 227 (1985). Therefore, in considering whether Petitioner was prejudiced by appellate counsel's representation in failing to raise trial IAC claims on appeal, this Court applies the *Strickland* standard in assessing trial counsel's representation. With regard to trial counsel's performance, this Court is mindful that "the relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133

1   F.3d 732, 736 (9th Cir. 1998).  To determine whether counsel's choices were reasonable, the

2   Court "must conduct an objective review of [counsel's] performance, measured for

3   reasonableness under prevailing professional norms, which includes a context-dependent

4   consideration of the challenged conduct as seen from counsel's perspective at the time."

5   *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted).  To

6   demonstrate prejudice, Petitioner "must show that there is a reasonable probability that, but

7   for counsel's unprofessional errors, the result of the proceeding would have been different.

8   A reasonable probability is a probability sufficient to undermine confidence in the outcome."

9   *Strickland*, 466 U.S. at 694.  Applying these standards, the Court concludes there is no

10  reasonable probability the Arizona Supreme Court would have granted relief had appellate

11  counsel presented these trial IAC allegations on direct appeal because trial counsel's

12  performance was neither deficient nor prejudicial.

13      **A.    Relevant Facts**

14      Testimony at trial established that before sunrise on January 13, 1984, the day after

15  Petitioner and his mother checked into the Blue Mist Motel, Petitioner purchased a buck

16  knife and a steak knife at a convenience store near the motel.  (RT 3/27/85 at 57-59.)[5]  He

17  told the sales clerk that one of the knives was a gift for his son.  (*Id.* at 61.)  Around 7:00

18  a.m., Petitioner telephoned a friend of his mother's, a woman who had driven Mrs.

19  Moormann to the prison for the visit.  He told her he needed to go to Mesa to see a lawyer.

20  (*Id.* at 22-23.)

21      Around 8:00 a.m., Petitioner went into a pizza parlor to buy a soda and told the

22  proprietor that he was on a furlough visit with his mother and they would be in later that

23  ─────────────

24      [5]      "RT" refers to the court reporter's transcript.  "ROA" refers to the six volumes
    of sequentially-numbered trial and post-conviction pleadings filed in the Pinal County
25  Superior Court.  These documents were provided to this Court on April 1, 1994, by the
    superior court. (Dkt. 74.)  The original trial transcripts, presentence report, and appellate
26  briefs were provided to this Court on November 11, 1997, by the Arizona Supreme Court.
27  (Dkt. 155.)

28                                   - 6 -

evening for dinner.  (*Id.* at 66.)  About an hour later, Petitioner borrowed cleaning supplies from the motel's owners.  (*Id.* at 43.)  He told them that his mother was sick and that maid service was unnecessary.  (*Id.* at 44.)  One of the owners testified that when she later saw Petitioner, he smelled badly and towels he placed outside of his room also had a foul odor.  (*Id.* at 45-47.)   Around 4:30 that afternoon, Petitioner asked about the motel's garbage schedule and said he had some spoiled meat that needed to be dumped.  (*Id.* at 53-54.)

That evening, Petitioner was seen walking near the motel with a trash bag in hand.  (*Id.* at 74.)  Sometime between 9:00 and 9:45 p.m., Petitioner stopped by a liquor store and asked to dispose of spoiled meat in the store's dumpster.  (*Id.* at 79.)  During their 15- to 20-minute conversation, Petitioner rambled to the store clerk about being involved in a diamond-buying business, being on furlough with his dad, his mother dying of cancer two weeks earlier, and his wife getting upset whenever he talked about the women's equal rights amendment.  (*Id.* at 78-80.)  Petitioner got fidgety and nervous when two police officers walked nearby.  (*Id.* at 80.)

Around 9:45 p.m., Petitioner went back to the pizza parlor and asked if he could put some animal waste in the restaurant's dumpster.  (*Id.* at 67.)  The restaurant's owner, who previously worked at the prison and knew Petitioner, observed that Petitioner appeared upset and nervous.  (*Id.*)  He refused the request and, suspecting something may be wrong, informed the police of his conversations with Petitioner.  (*Id.* at 69.)

Around 11:00 p.m., two police officers stopped by Petitioner's motel room and inquired as to Mrs. Moormann's welfare.  (RT 3/28/85 at 13.)  Petitioner, who appeared nervous, was clad only in a pair of unzipped pants with his genitals exposed.  (*Id.* at 13, 26-28.)  He told the officers that she felt better and left with a friend around 6:00 p.m. but had not yet returned.  (*Id.* at 15-16.)

Shortly after midnight, Petitioner telephoned an employee of the state prison, Luther Damman, whom Petitioner had known for eight or nine years.  (*Id.* at 4-6.)  Petitioner told him he had a problem, that a cousin had dropped off some dog bones and other garbage in

- 7 -

1   need of disposal, but that the motel dumpster was full.  (*Id.* at 7.)  Damman agreed to help

2   and arrived at the motel minutes later.  (*Id.* at 7-8.)  Petitioner placed a box in the back of the

3   truck and asked if he could get a ride back to his housing unit to get something.  (*Id.* at 8.)

4   Damman refused, drove back to the prison, and left the box at a dumpster.  (*Id.*)

5        Twenty minutes later, police officers returned to the motel parking lot.  (*Id.* at 18.)

6   Petitioner came out of his room and told them his mother had not yet returned.  (*Id.*)  More

7   officers arrived, and several of them accompanied Petitioner to look around his room.  (*Id.*

8   at 19.)  Petitioner then told a different story:  his mother had asked him to go to the store and

9   purchase a knife as a gift for someone, and when he returned, she was gone.  (*Id.* at 20-21.)

10  The officers left but continued to observe the room from a distance.  (*Id.* at 21.)

11       About an hour later, Luther Damman received a call from the Florence Police

12  Department inquiring about Petitioner.  (*Id.* at 9.)  He was told about the search for

13  Petitioner's mother and about Petitioner's inquiry regarding the pizza parlor dumpster.

14  Damman immediately retrieved the box he had placed in the prison's dumpster and gave it

15  to the police, who took it to a hospital for analysis.  (*Id.* at 10.)

16       Around this same time, Petitioner left his room to use a pay telephone.  (*Id.* at 22.)

17  Officers parked near Petitioner and asked if he wanted to sit in the patrol car to await his

18  mother's return.  (*Id.* at 23.)  Petitioner acquiesced, got into the vehicle, engaged in some

19  general conversation, and napped on and off.  (*Id.*)  Around 2:45 a.m., the officers learned

20  that the box picked up by Damman contained human body parts.  (*Id.* at 24.)  Petitioner was

21  placed under arrest for suspicion of murder, and he told officers he wanted to make a full

22  confession.  (*Id.* at 25.)  While en route to the police station, Petitioner stated, "You can

23  change the charge, she is dead."  (*Id.*)

24       Before the recorded interrogation began, Petitioner made comments to the effect that

25  his mother had made him take his father's place and do things he could not handle, and that

26  he had just "popped" and "lost his cool."  (*Id.* at 31.)  Minutes later, with the tape recorder

27  on, Petitioner made a full confession:

28                                             - 8 -

Q:      . . . Would you like to tell us what happened today?

A:      Well, my mom and I had a – we had a argument, and dur- – during it I hit her a few times, and then it got worse and I – I lost my cool and – and I tied her up, and she kept on me, talkin' about things that, uh, pertained to my real family and, I don't remember the exact time, and I suffocated her. Then I took the 409 and went into the wash room.  I panicked, at which time I dissected her.

. . . .

Q:      . . . Did you, uh, what – what did you use to, uh, suffocate her?

A:      A pillow.

Q:      Okay.  Was that, uh – was she in the bed, Robert?

A:      The bed closest to the bathroom.

Q:      On the bed closest to the bathroom.  Okay.  And then you, uh, you held a pillow over her face?

A:      Yeah, and kept it till she was dead.

Q:      You had – you had tied her up before then?

A:      Yes.

Q:      What did you tie her up with, Robert?

A:      I tore a towel up.

(Dkt. 61, Ex. B at 2-4.)  In several trash dumpsters, the police discovered numerous plastic bags containing Mrs. Moormann's remains, a razor, and torn towel pieces.  In the motel room, officers found two knives and evidence of blood on the bathroom floor and walls.  The medical examiner confirmed that Mrs. Moormann died as a result of suffocation, that she had been stabbed in her right breast and buttocks with the tip of a knife and bruised prior to death, that abrasions on her lips were consistent with having been gagged, and that she had been meticulously dismembered.  (RT 3/28/95 at 69-70, 78-83.)

A search of Petitioner's prison cell uncovered a handwritten document that purported to be a codicil to the victim's will.  It was dated the day following Petitioner's furlough release and proposed to immediately trade the bulk of Mrs. Moormann's property (valued around $300,000) in exchange for shares in a business of Petitioner's.  (RT 3/29/85 at 27;

1    Dkt. 62, Ex. OO.)   Although Petitioner had already been named the beneficiary of his

2    mother's estate, her will directed that the estate be placed in trust for him because she

3    believed he was "not competent to effectively handle his own affairs." (Dkt. 62, Ex. PP.)

4    Testimony at trial also established that the victim was planning to relocate to Oklahoma. (RT

5    3/29/85 at 30.)  The State argued that this evidence established premeditated murder.  (RT

6    4/4/85 at 11-13.)

7            In defense, Petitioner admitted the killing but claimed he was not guilty by reason of

8    insanity.   His psychological expert, Dr. Daniel Overbeck, testified to Petitioner's past

9    evaluations by medical, psychiatric, and psychological specialists.   In particular, the expert

10   discussed a history of varied diagnoses including psychosis, cerebral palsy, mental

11   retardation, and organic brain disorder, as well as Petitioner's past treatment with anti-

12   psychotic medications.   Dr. Overbeck concluded that Petitioner suffered from possible

13   organic delusional syndrome, probable persisting pedophilia, and a schizoid personality

14   disorder.  (RT 4/2/85 at 28-29.)  Features supporting this diagnosis included Petitioner's

15   disheveled, bizarre appearance and dress following his mother's killing, his impaired social

16   and occupational functioning, and his difficulty coping with stressful situations.  Based on

17   his diagnosis, Dr. Overbeck opined that Petitioner was unable, on the night of his mother's

18   death, to know or appreciate the nature and consequences of his conduct. (*Id.* at 42.)

19           The State also presented expert testimony concerning Petitioner's state of mind.  Dr.

20   Michael Cleary, a psychiatrist, diagnosed Petitioner as suffering from pedophilia and an

21   antisocial personality disorder.  (ROA at 133.)  He testified to his initial conclusion that

22   neither of these conditions prevented Petitioner from knowing the nature and quality of his

23   acts.  He also testified, however, that upon examination of further materials, including some

24   bizarre letters written by Petitioner prior to the murder, his conclusion had changed from

25   definite to not certain.  (RT 4/3/85 at 33.)  Specifically, Dr. Cleary noted that:

26           the relationship with [Petitioner's] mother which had been inferred in a
             number of items that I had seen began to take somewhat clearer shape, and this
27           contributed to a picture of an individual who had these basic problems, the

28                                              - 10 -

1
2
3

> personality problem, the pedophilia, seemed to have a pretty unhealthy relationship with the mother, and when writing letters in prison seemed to express some pretty far out thought content which while not necessarily a psychotic might be tending in that direction.

(*Id.* at 34.) Dr. Cleary further stated that he "would not give [Petitioner] a clean bill of health emotionally or mentally" and that Petitioner's writings were "bizarre" and could be indicative of a mental defect. (*Id.* at 56, 58.) With respect to the relationship between Petitioner and his mother, Dr. Cleary testified that it was possible the relationship caused Petitioner to enter either an acute psychotic state the night of her death, during which one "would not basically know what was going on or what they were doing," or a depersonalized state, during which he would have felt outside of his own body but aware of what was going on. (*Id.* at 59.) When pressed by the prosecutor, Dr. Cleary explained:

> I can't say whether do I believe he was in an acute psychotic state. I really don't know. . . . What I am saying is that it is possible that there were other elements influencing his mental state or his mental picture and I really can't say if it amounted to an acute psychotic state or not. The time is too far back.

(*Id.* at 77.)

Another prosecution witness, Dr. Maier Tuchler, testified that Petitioner knew the nature and quality of his actions. However, he also opined that Petitioner had a "sick, sexual dependence on a dominating mother." (*Id.* at 127.) In addition, with respect to Petitioner's actions on the night of the crime, Dr. Tuchler stated: "I don't think there was a deliberate effort to kill his mother. I think it was accidental." (*Id.* at 130.)

Finally, the State presented the testimony of Dr. Harvey Buchsbaum, a neurologist appointed at the request of Petitioner's expert, Dr. Overbeck. In his report, Dr. Buchsbaum stated that he saw Petitioner for a neurologic consultation, but was "not exactly sure why he is here." (ROA at 105.) He noted a psychiatric history, as well as a history of psychotropic drugs and EEGs, some of which were abnormal. Nonetheless, his exam revealed no abnormalities and he found "no reason to further evaluate him neurologically." (*Id.*) At trial, Dr. Buchsbaum testified that he found no neurological deficits. (RT 4/3/85 at 145.) On cross-examination, however, he acknowledged telling Dr. Overbeck that "most neurologists

1   would say somewhere around birth something probably did happen to his brain that lowered

2   his intelligence and accounts for his behavior." (*Id.* at 149.)  Thus, although he could not

3   identify a specific deficit, he conceded that one may nonetheless exist.  (*Id.* at 150.)

4   **B.   Alternative Defenses**

5   In his first PCR petition, Petitioner argued that counsel was ineffective for not

6   developing a theory that Petitioner had acted impulsively.  In support of this argument

7   Petitioner cited the details of his confession, in which he indicated that he and his mother had

8   argued, that she aggravated him by referring to his real family, and that he lost his cool and

9   suffocated her. (Dkt. 161, Ex. KK at 21-22.)  In his second PCR petition, Petitioner asserted

10  that counsel was ineffective for not arguing accident (based on Dr. Tuchler's testimony) as

11  an alternate theory of defense.[6]  (Dkt. 161, Ex. W at 6-8.)    In his post-remand brief,

12  Petitioner argues that, had counsel conducted an adequate investigation, he could have

13  "discovered significant evidence supporting a defense under Arizona law to first degree

14  murder." (Dkt. 198 at 9.)  Specifically, Petitioner asserts that counsel should have pursued

15  a defense under *State v. Christensen*, 129 Ariz. 32, 34, 629 P.2d 580, 582 (1981), based on

16  Petitioner's long history (and character trait) of acting impulsively and reflexively in

17  response to stressful circumstances.  (Dkt. 198 at 9.)  He further asserts that had counsel

18  conducted an adequate investigation into Petitioner's life history (most notably the alleged

19  sexual abuse by his adoptive mother), a qualified medical expert would have concluded that

20  Petitioner was incapable of premeditating or intending his mother's murder.  (*Id.* at 9-10.)

21  Petitioner's claim hinges on two intertwined but faulty theories. First, the record does

22  not support his allegation that counsel failed to investigate the veracity of Petitioner's

23  statements concerning sexual abuse by his mother.  Second, with heavy reliance on expert

24  _____

25  [6]      Although Petitioner includes "accident" in the caption of his argument in his

26  post-remand brief (Dkt. 198 at 5), the brief does not actually address counsel's failure to
     pursue an accident defense; rather, Petitioner's argument centers on counsel's failure to

27  establish that the crime was not premeditated.

28

1    evaluations prepared for these habeas proceedings that conclude Petitioner's abuse

2    allegations are credible, Petitioner conflates a *Christensen* impulsivity defense with a

3    diminished mental capacity defense, the latter of which is not a recognized defense in

4    Arizona.

5         1.    Performance: Evidence of sexual abuse

6         Petitioner has proffered a declaration from trial counsel that is notably devoid of any

7    reference to his investigation regarding the alleged sexual abuse.   (*See* Dkt. 201.)

8    Nonetheless, the Court can discern from letters counsel sent to Dr. Cleary prior to trial that

9    counsel attempted to corroborate the abuse allegations.   In the first letter, counsel wrote:

10            When last we spoke, you advised that if confirmation of the incestuous
              relationship between Robert and his mother was provided to you, you might
11            re-evaluate your opinion as to Robert's mental condition at the time of Mrs.
              Moormann's death.

12            I am enclosing a tape recorded statement of Mrs. Elizabeth Baker
13            which, I believe, substantiates the relationship above-mentioned.  I will be
              forwarding to you documents which establish that Mr. Moormann's parole
14            officer also believed that the relationship existed and confirm that Robert had
              told [parole officer] Medrano of the relationship.

15    (Dkt. 146, Ex. 50 at 2.)  Dr. Cleary's notes from listening to the tape indicate that Petitioner

16    told Mrs. Baker that he and his mother had been sleeping together since he was a young boy.

17    (*Id.*, Ex. 51.)  A second letter from counsel to Dr. Cleary included notes prepared by Dr.

18    Dave White, a clinical psychologist who had counseled Petitioner in 1979 as part of

19    Petitioner's parole supervision following his release from prison for the 1972 kidnapping

20    conviction.[7]  The notes recommended that, as a result of confidential information revealed

21    by Petitioner, Petitioner and his mother should remain physically separated.  (*Id.*, Ex. 46.)

22    Petitioner's assertion that counsel failed to investigate the veracity of Petitioner's allegations

23    of abuse is belied by this record.

24

25    _____

26        [7]    Petitioner was paroled from the Arizona Department of Corrections in January
      1979 and jailed in August 1979 on a parole violation for possessing a gun.  (Dkt. 146, Ex.
27    9 at 1-2.)  Thereafter, parole was revoked and he was reincarcerated.

28                                        - 13 -

1    Petitioner also asserts that Dr. Overbeck's diagnosis was based on the "false

2  assumption" that Petitioner's allegations of sexual abuse by his mother were not true.  (Dkt.

3  198 at 7-8, 12.)  This mischaracterizes the expert's evaluation.  In his report, Dr. Overbeck

4  noted the many, varied past diagnoses of Petitioner and concluded that, regardless of whether

5  the sexual abuse actually occurred, Petitioner suffered from a significant mental defect:

6         Numerous evaluations of functioning have been conducted throughout
   Mr. Moormann's life, beginning at approximately two years of age.  Findings
7  of atypical development – physical, socioemotionally and cognitively – have
   been routine.  At various times, Mr. Moormann has been diagnosed as
8  exhibiting cerebral palsy; moderate mental retardation to possibly above
   average intelligence; mild mental retardation with behavioral reaction; chronic
9  brain syndrome associated with birth trauma with mental retardation and
   behavioral reaction; mild mental retardation associated with pedophilia; mental
10 deficiency (mild) with behavioral and possible psychotic reaction; no mental
   retardation – without mental disorder/pedophilia; and, schizoid personality
11 disorder associated with sexual deviation/pedophilia.  Despite variability
   among the clinical abnormalities reported, the diagnoses consistently reflected
12 the presence of a marked, disabling mental disorder.

13        The contradictions among the different diagnoses are, in the opinion of
   this examiner, not significant; it is likely that the nature of Mr. Moormann's
14 disorder is such that, different elements emerge as preeminent at the times of
   the evaluations.  Consistently, however, several recurring themes are
15 presented: inability to reliably reflect age-appropriate socioemotional function,
   pathological psychosexual development manifested in pedophilia and a
16 persistent pattern of antisocial acts.  The issue of an incestual relationship
   between Mr. Moormann and his adoptive mother and father cannot at this time
17 be confirmed.  *If the chronic sexual abuse reported is indeed valid, the
   significance of the persistent developmental trauma cannot be denied.  If the*
18 *chronic sexual abuse reported is not valid, this examiner feels that the abuse
   is part of Mr. Moormann's perceptual reality – i.e., he truly believes that it did*
19 *occur – and as such may represent a pervasive delusional system that has
   continued to compromise Mr. Moormann's adaptive and social functioning*.

20        . . . Whether or not the reported sexual relationship between he and his
21 mother was factual, this examiner's strongly held opinion considers that
   presently, at the time of the alleged offenses, and probably throughout his adult
22 life, Mr. Moormann's adaptive functioning has been impaired because of a
   persistent, debilitating mental defect.

23 (ROA at 116-17 (emphasis added).)  At trial, Dr. Overbeck reiterated that he had no way to

24 verify the nature of the relationship between Petitioner and his mother and so assumed that

25 "either one, it was valid and he was reporting it accurately, in which case we would be

26 looking at a simple organic syndrome, or, two, I had to consider the fact that the information

27

28                                    - 14 -

1   he was giving me was either intentionally or unintentionally distorted" and thus he suffered

2   from organic delusional syndrome.  (RT 4/2/85 at 29, 74.)  After being pressed by the

3   prosecution, he said he was 75% sure that the delusional component existed.  (*Id.* at 52.)

4        Dr. Cleary similarly observed that "there is no independent confirmation of [an

5   incestuous relationship], and no way of knowing how much is factual and how much

6   distortion or fantasy is involved."  (ROA at 132.)  After reviewing the Baker tape and Dr.

7   White's notes, Dr. Cleary apparently concluded that Petitioner's relationship with his mother

8   was "unhealthy" and "complicated," but did not assert that the allegations of abuse were

9   credible.  (RT 4/3/85 at 34, 43.)  Only Dr. Tuchler, who testified for the prosecution,

10  concluded that Petitioner's allegations were factual.  (*Id.* at 129.)  However, he also

11  acknowledged that his opinion was based entirely on Petitioner's statements and that he had

12  no way to corroborate the story.  (*Id.* at 129-30.)

13       Petitioner has submitted declarations from new experts opining that his incest

14  allegations are credible, primarily because he has given consistent statements regarding the

15  abuse to numerous individuals both before and after the killing.  (Dkt. 146, Ex. 8 at 18-23;

16  Dkt. 154, Ex. E at 98-104, 115-16.)  However, Petitioner has focused on what "defense

17  counsel could have presented, rather than upon whether counsel's actions were reasonable."

18  *Turner v. Calderon*, 281 F.3d 851, 877 (9th Cir. 2002).  Here, counsel was aware that none

19  of the experts could say with certainty whether the abuse had occurred.  Furthermore, there

20  was no physical evidence to corroborate Petitioner's claim that he and his mother were

21  engaged in sexual relations at the time of the offense.

22       Specifically, Petitioner told Dr. Tuchler that his mother wanted her breasts pinched

23  during intercourse and that the suffocation occurred when he covered her with a pillow to

24  quiet her exclamations.  (RT 4/3/85 at 128.)  However, the medical examiner testified that

25  his examination of the victim revealed no evidence of sexual activity (RT 3/28/85 at 79-80),

26  and no evidence of semen was found on the motel bedspread, sheets, or mattress pad (RT

27  3/29/85 at 16-17).  In addition, bruises on the victim's breast, arm, legs, and lower back

28                                      - 15 -

indicated she had been hit with a "moderate degree of force" such as "a fairly strong punch with the fist" within an hour to twelve hours prior to being dismembered.  (*Id.* at 66-69, 76.)  The medical examiner also testified that the bruises on the victim's breast were not consistent with having been pinched with fingers.  (*Id.* at 88.)  More significantly, incise wounds on the victim's right breast and buttocks, consistent with being stabbed with the tip of a knife, established that Petitioner obtained the knives before the suffocation occurred (*id.* at 71, 76-77, 98); and evidence of bruising, discoloration, and fibers in the victim's mouth showed that she had been gagged prior to death (*id.* at 81-83, 125).  Although the dismemberment prevented the medical examiner from determining whether the victim had been bound at the wrists and ankles, numerous pieces of torn towel were found in trash bins along with the victim's remains.  (*Id.* at 115-16, 121.)

In addition to the compelling physical evidence undermining Petitioner's claim of sexual relations with his mother at the time of the offense and the lack of evidence corroborating the abuse generally, counsel's investigation uncovered instances of Petitioner's bizarre behavior that support the reasonableness of his decision to portray the alleged abuse as a delusion, thereby supporting Dr. Overbeck's diagnosis of organic delusional syndrome.  (*See* RT 4/3/85 at 126-30 (cross-examination of Dr. Tuchler).)  For example, witnesses who knew Petitioner through their work at the prison described Petitioner's steadfast belief in the success of far-fetched, unrealistic business ventures.  (RT 3/29/85 at 42-45, 51-52, 56-59, 62-63, 65-66.)  While on parole in 1979, Petitioner told family friend Elizabeth Baker that he had ties to the mafia and was related to Joe Bonanno.  (RT 4/2/85 at 109-10.)  Unbeknownst to her, he had listed Baker as vice president, secretary, and treasurer of his business, RHM Enterprises.  (*Id.*)  A letter found in Petitioner's prison cell after the murder described wanting to train a pet to write letters and transfer money between accounts, and other writings contained bizarre sexual stories.  (RT 4/3/85 at 58; RT 4/4/85 at 31.)

Also, it is not evident that Petitioner's newly-proffered "background" evidence, which

1   allegedly corroborates the victim's abuse of Petitioner, would have been admitted at trial.[8]

2   The available evidence of the abuse is based solely on Petitioner's own statements. *Cf. State*

3   *v. Barger*, 167 Ariz. 563, 810 P.2d 191 (Ct. App. 1990) (holding that statements made by

4   defendant to police asserting he felt threatened by victims were hearsay and not within any

5   hearsay exceptions); *Turner v. Calderon*, 281 F.3d at 877 (observing that declarations

6   proffered to establish victim's predatory nature lacked legal foundation for knowledge of

7   victim's reputation and relied heavily on inadmissible hearsay).  Moreover, assertion of past

8   abuse by a victim does not appear to fall within any of Arizona's recognized justification

9   defenses.  *See* A.R.S. §§ 13-402 to 13-412 (West 1978).  Petitioner has not asserted that he

10  acted in self-defense, and the defense of duress is expressly precluded for homicide offenses.

11  A.R.S. § 13-412(C) (West 1978).

12      Counsel adequately investigated the abuse allegations and provided that evidence to

13  mental health experts.  The choice to forego an abuse "defense" does not appear to have been

14  unreasonable in light of the evidentiary limitations.

15      2.    Performance: *Christensen* defense

16      The crux of Petitioner's argument is that counsel should have focused on the alleged

17  history of abuse – and enlisted a medical expert qualified to testify about Petitioner's state

18  of mind as a result of the abuse – to establish that Petitioner was "*incapable* of premeditating

19  or intending" his mother's death.  (Dkt. 198 at 10 (emphasis added).)  As just discussed, there

20  was little factual foundation to support Petitioner's allegations of abuse.  Moreover, this

21  argument is tantamount to a diminished mental capacity defense, which has long been

22  rejected as an affirmative defense in Arizona.  *State v. Mott*, 187 Ariz. 536, 540-41, 931 P.2d

23

24  _____

25          [8]    Petitioner's brief focuses on the relevance of this evidence primarily to a
    diminished capacity defense – that because he had been abused by his mother since
26  childhood, he was incapable of intending or premeditating her death – rather than as a stand-
    alone abuse defense.  (*See, e.g.*, Dkt. 198 at 9-10.)  However, as explained below, Arizona
27  does not recognize diminished capacity as a defense.

28                              - 17 -

1046, 1050-51 (1997) (citing *State v. Schantz*, 98 Ariz. 200, 212-13, 403 P.2d 521, 529 (1965)).  Rather, Arizona has adopted "the *M'Naghten* test 'as the sole standard for criminal responsibility.'" *Mott*, 187 Ariz. at 541, 931 P.2d at 1051 (quoting *State v. Ramos*, 133 Ariz. 4, 6, 648 P.2d 119, 121 (1982)).  Under that test, "[a] person is not responsible for criminal conduct by reason of insanity if at the time of such conduct the person was suffering from a mental disease or defect as not to know the nature and quality of the act or, if such person did know, that such person did not know that what he was doing was wrong."  A.R.S. § 13-502(A) (West Supp. 1983-84).  Consequently, "Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime."  *Mott*, 187 Ariz. at 541, 931 P.2d at 1051.  The practical effect of this rule is that a defendant cannot, during trial, present evidence of mental disease or defect to show that he was *incapable* of forming a requisite mental state for a charged offense.  *Id.* at 540, 931 P.2d at 1050; *Schantz*, 98 Ariz. at 213, 403 P.2d at 529; *see also Clark v. Arizona*, 126 S. Ct. 2709, 2737 (2006) (upholding the constitutionality of the *Mott* rule and finding that the exclusion of expert testimony regarding diminished capacity does not violate due process).  Thus, the general premise of Petitioner's claim – that counsel should have secured an expert witness to opine that Petitioner was incapable of premeditating or intending to kill the victim given her past abuse of him – necessarily fails.  (Dkt. 198 at 11.)

　　　Arizona law does permit a defendant to present evidence that he has a *character trait* for acting reflexively, rather than reflectively, for the purpose of negating a finding of premeditation – i.e., to show that he likely did not actually reflect after forming the requisite intent.  *See State v. Christensen*, 129 Ariz. at 35-36, 628 P.2d at 583-84; *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986).  In *Christensen*, the defendant sought to admit expert testimony regarding his tendency to act without reflection.  The Arizona Supreme Court held it was error to exclude such testimony because "establishment of [this character trait] tends to establish that appellant acted impulsively.  From such a fact, the jury could have concluded

that he did not premeditate the homicide." *Christensen*, 129 Ariz. at 35, 628 P.2d at 583. However, the *Christensen* rule is limited in that an expert cannot testify as to whether the defendant was acting impulsively at the time of the offense. *Id.* at 35-36, 628 P.2d at 583-84; *see also State v. Arnett*, 158 Ariz. 15, 22, 760 P.2d 1064, 1071 (1988) (emphasizing that although expert testimony is admissible to establish personality trait of acting without reflection, testimony of a defendant's probable state of mind at time of the offense is not permitted); *State v. Rivera*, 152 Ariz. 507, 514, 733 P.2d 1090, 1097 (1987) (same).

Because *Christensen* is limited to general character trait evidence and Arizona does not recognize diminished capacity as a defense, counsel's failure to secure an expert to testify that he "could not, and did not, form the intent to kill his mother" (Dkt. 198 at 22) was not constitutionally deficient. Short of addressing *M'Naghten* insanity, such an expert would not have been permitted to testify either to Petitioner's alleged inability to form the requisite mental state, *Schantz*, 98 Ariz. at 212-13, 403 P.2d at 529, or his probable state of mind at the time of the offense, *Christensen*, 129 Ariz. at 35-36, 628 P.2d at 583-84. Moreover, as discussed next with regard to prejudice, the failure to more fully pursue impulsivity as a defense was not unreasonable because there was little evidence that the killing was impulsive. *Cf. LaGrand v. Stewart*, 133 F.3d 1253, 1272 (9th Cir. 1998) (finding no ineffectiveness for failing to present impulsivity defense where the evidence did support such a defense).

3.      Prejudice

Even if trial counsel's performance had been deficient, there is no reasonable probability that Petitioner could have established prejudice if appellate counsel had raised this claim on appeal. In Arizona, first-degree murder is distinguished from the lesser-included offense of second-degree murder only by the element of premeditation. *Christensen*, 129 Ariz. at 35, 628 P.2d at 583. A defendant kills with premeditation if he "acts with either the intention or knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection." A.R.S.

1   § 13-1101(1) (West 1978).  "An act is not done with premeditation if it is the instant effect

2   of a sudden quarrel or heat of passion."  *Id.*

3        In its closing argument, the State did not assert that Petitioner had planned the killing

4   far in advance.  Rather, the prosecution argued that, before he was released on furlough,

5   Petitioner knew his mother was leaving Arizona and wanted money from her, as evidenced

6   by the codicil and other documents found in his cell.  (RT 4/4/85 at 11.)  The State also

7   argued that because the victim had numerous small cuts, which were likely made with the

8   tip of a knife, Petitioner must have tied and gagged her before walking to the store to buy the

9   knives.  (*Id.* at 14.)  This walk would have taken fifteen or twenty minutes – enough time,

10  according to the prosecutor's theory, "to think about what has happened and what is going

11  to happen."  (*Id.*)  The State further argued that Petitioner's meticulous removal of his

12  mother's fingers and effort to flush the fingers down a toilet evidenced Petitioner's attempt

13  to prevent identification of the body.  (*Id.* at 15.)

14       After careful review of the record, the Court finds there is no reasonable probability

15  the jury would have acquitted Petitioner of first-degree murder had trial counsel introduced

16  additional evidence of Petitioner's impulsive personality.  No expert would have been

17  allowed to testify that Petitioner was acting impulsively at the time of the murder.

18  *Christensen*, 129 Ariz. at 35-36, 628 P.2d at 583-84.  Rather, the testimony "would have been

19  limited to a general description of [Petitioner's] behavioral tendencies."  *Summerlin v.*

20  *Stewart*, 341 F.3d 1082, 1095 (9th Cir. 2003) (en banc), *rev'd on other grounds*, 542 U.S.

21  348 (2004).  As such, it would have had only marginal probative value in determining

22  whether Petitioner lacked premeditation at the time of the offense, particularly in light of the

23  evidentiary record.  Similarly, even if Petitioner could have presented evidence that his

24  mother had sexually abused him since childhood, such evidence does not establish that

25  Petitioner did not intend or premeditate her death.

26       Although counsel did not in his closing argument urge against a finding of

27  premeditation – focusing instead on the insanity defense – some evidence of impulsivity and

28                                          - 20 -

abuse was before the jury.  For example, Dr. Overbeck testified to Petitioner's susceptibility to stress (RT 4/2/85 at 41), a family friend who had known Petitioner most of his life testified that Petitioner was an impulsive individual (RT 3/29/85 at 34), and each of the experts referenced Petitioner's allegations of abuse (RT 4/2/85 at 29; RT 4/3/85 at 59).  Nonetheless, the evidence at trial weakened any claim that Petitioner acted impulsively or as the result of a sudden quarrel.

The cut marks on the victim's body suggested that Petitioner left the motel to buy the knives while the victim was still alive.  The evidence also established that she had been gagged prior to being killed, undermining Petitioner's assertion to the police that he suffocated her with a pillow to stop her "talkin' about things that, uh, pertained to [his] real family" (Dkt. 61, Ex. B at 2-4) and his claim to Dr. Tuchler that she accidentally suffocated when he covered her with a pillow to quiet her moans during sex (ROA at 98).  In addition, the act of poking the victim with the tip of a knife five or six times before she died contradicted any claim that she was suffocated in an act of rage.  Finally, the documents found in Petitioner's prison cell relating to the victim's will and properties, combined with his calling his mother's friend asking for a ride to see a lawyer, suggested that Petitioner had planned to obtain his mother's assets.  There is no reasonable probability that additional evidence of Petitioner's impulsive personality would have affected the verdict.

4.    Conclusion

"It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable." *Strickland*, 466 U.S. at 689.  In this case, trial counsel's defense options were limited given the physical evidence presented at trial, Petitioner's conflicting statements as to the circumstances under which he suffocated his mother, and the unavailability of a diminished mental capacity defense under Arizona law.  Counsel's emphasis on insanity and his failure to assert alternative defenses based on accident, abuse, or impulsivity was neither

1    deficient nor prejudicial.  Consequently, the Court concludes there is no reasonable

2    probability Petitioner would have prevailed on appeal had appellate counsel raised an IAC

3    claim based on trial counsel's failure to assert alternative defenses.  Accordingly, Petitioner

4    has failed to establish cause and prejudice for the default of this trial IAC claim.

5        **C.    Lesser-Included-Offense Instructions**

6        Petitioner argues that counsel was ineffective for failing to request jury instructions

7    on second-degree murder and manslaughter when the evidence presented at trial warranted

8    such instructions.  (Dkt. 198 at 6-7.)

9        1.    Relevant Facts

10       At the close of evidence, the trial judge and counsel worked on jury instructions in

11   chambers without Petitioner or a court reporter present.  (*See* RT 4/3/85 at 154).  The next

12   day, after counsel made closing arguments and the jury retired for deliberation, the following

13   discussion ensued:

14           THE COURT:  Now, I guess there is some record that should be made
             insofar as the forms of verdicts are concerned and then later you may want to
15           make a record on the instructions.

16                   . . . .

17           The record may also show at the time of settling instructions and
             discussing the verdicts, the question arose as to whether the jury would be
18           instructed on second degree murder and on manslaughter.  Counsel and the
             Court discussed that matter.  The Court stated that it was inclined to give the
19           instruction on those two if requested to do so by Defense Counsel.  State
             opposed the giving of any form of verdict other than the first – on first degree
20           murder, and cited State versus Vickers as authority along with the case is [sic]
             cited in the Vickers case.

21
             I requested [defense counsel] to consider whether or not he wished to
22           request those instructions and forms of verdict on the lesser offenses.  *He
             stated that he wished to do so and that he also wished to discuss it with his
23           client.*

24           This morning before we started court, [defense counsel] informed me
             that he did not wish to have forms of verdicts as to second degree murder and
25           as to manslaughter.  Nor did he wish to have the jury instructed on those.  I
             stated a further record could be made by the attorneys on that matter at the first
26           convenient time with the same effect as if made before we started argument.

27           Now you can make any further record.

28                                       - 22 -

1          MR. KELLY:  Not on that matter, Your Honor.

2          *I did – I did discuss with my client the various options concerning
charging the jury and the forms of verdict, and it was agreed after speaking
3          with him the course of action that we took.*

4    (RT 4/4/85 at 59-60 (emphasis added).)

5          On direct appeal, appellate counsel argued that the trial court should have *sua sponte*

6    provided lesser-included instructions.  In denying this claim, the Arizona Supreme Court

7    stated:

8          While the parties were discussing jury instructions, the trial judge said
he was inclined to give the jury an option of convicting Moorman of second
9          degree murder or manslaughter instead of first degree murder.  In response,
Moorman's attorney said he and his client had discussed the matter and
10         decided that they wanted the jury instructed only on first degree murder.
Moorman was not present when this record was made.  In his brief on appeal,
11         Moorman claims that he does not recall any discussion of lesser-included
offenses or any agreement with his lawyer on the issue.  Moreover, Moorman
12         contends that even if he objected to the giving of lesser-included instructions,
the trial court had an obligation to give the instructions under *Beck v.*
13         *Alabama.*

14         We need not review the record in depth to determine whether the
evidence supported the lesser-included instruction.  We see no reason why a
15         murder defendant cannot knowingly waive his constitutional right to lesser-
included instructions.  Apparently, the decision not to request instructions on
16         second degree murder or manslaughter was strategic.  We have no evidentiary
record on Moorman's claims that his attorney never discussed the matter with
17         him.  We therefore do not decide that issue.

18   *Moorman*, 154 Ariz. at 586-87, 744 P.2d at 687-88.

19         2.    Analysis

20         A defendant has a due process right to a lesser-included-offense instruction when the

21   evidence warrants such an instruction.  *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Beck v.*

22   *Alabama*, 447 U.S. 625, 637-38 (1980).  A lesser-included-offense instruction is warranted

23   if "there was evidence which, if believed, could reasonably have led to a verdict of guilt of

24   a lesser offense."  *Hopper*, 456 U.S. at 610.  Even if warranted, a defendant may forego such

25   instructions.  *Look v. Amaral*, 725 F.2d 4, 9 (1st Cir. 1984).  "The decision not to request a

26   lesser included offense instruction falls within the wide range of reasonable professional

27   representation."  *Woratzeck v. Ricketts*, 820 F.2d 1450, 1455 (9th Cir. 1987), *vacated on*

28                                          - 23 -

1    *other grounds*, 486 U.S. 1051 (1988); *see also Clabourne v. Lewis*, 64 F.3d 1373, 1382-83

2    (9th Cir. 1995) (analyzing failure to request jury instruction as tactical decision by counsel).[9]

3           In support of this claim, Petitioner has proffered a declaration from trial counsel that

4    states: "I do not remember the details regarding the discussions Robert and I had on the

5    lesser included offense instructions. But I do know that I did not make a strategic decision

6    to not request those instructions." (Dkt. 201 at 2.) This assertion, unsupported by any

7    specific recollection, is not persuasive in light of the trial record.[10] Petitioner has proffered

8    nothing to suggest that the sequence of events as reflected in the transcript is inaccurate –

9    counsel initially wanted the instructions but after consulting with his client chose to forego

10   them. (RT 4/4/85 at 59-60.) Trial counsel's declaration states that he "tried talking to Robert

11   about the instructions."[11]   (Dkt. 201 at 2.)   The Arizona Supreme Court concluded that

12   foregoing the instructions was a strategic choice, and this Court agrees.

13          At the time of Petitioner's trial, insanity was a complete defense in Arizona. In other

14

15          [9]    A defendant has no federal constitutional right to be present at a conference

16   between a trial court and counsel on jury instructions. *United States v. Sherman*, 821 F.2d
     1337, 1339 (9th Cir. 1987).  Therefore, to the extent Petitioner's claim is based on his

17   absence at the settlement of jury instructions or his lack of personal waiver of lesser-

18   included-offense instructions, such allegations are plainly meritless.

19          [10]    In evaluating the credibility of the assertions contained in trial counsel's

20   declaration, the Court notes that the declaration contains at least one unsupported statement.
     Trial counsel claims "there was a problem getting the money from the county that we needed

21   to adequately present our insanity defense. I had to fight very hard to get the trial court to
     approve the appointment of Dr. Daniel Overbeck, the psychologist, who testified at Robert's

22   trial." (Dkt. 201 at 1-2.) This assertion (relevant only to the procedurally-barred IAC claim

23   concerning counsel's representation regarding the insanity defense) is contradicted by the
     record, which reflects that the trial court timely granted each of Petitioner's funding requests.

24   (*See* ROA at 63, 67, 70, 82, 92, 103, 123, 178, 180, 375, 378.)

25          [11]    This aspect of trial counsel's declaration undermines any assertion that counsel

26   failed to discuss the issue of lesser-included-offense instructions with Petitioner. Moreover,
     Petitioner has proffered no evidence, such as his own declaration, to contradict counsel's

27   statement during trial that he discussed the verdict options with Petitioner. (RT 4/4/85 at 60.)

28                                          - 24 -

words, a "not guilty by reason of insanity" verdict did not mandate commitment. Rather, such a defendant would be subject to civil commitment proceedings and treated the same as any other patient. If the court found that the defendant was not a danger to himself or others, release was required.[12] Ariz. R. Crim. P. 25 & cmt. (West 1973). Conviction on either second-degree murder or manslaughter would have required significant time in prison, especially in light of Petitioner's prior felony conviction. *See* A.R.S. §§ 13-604, 13-701 (West 1978 & Supp. 1983). The Court does not find it unreasonable for counsel to forgo instructions on lesser-included offenses where, as here, the defense has expert evidence to support an insanity defense and the prosecution's evidence of premeditation is strong. By not requesting lesser-included-offense instructions, the defense eliminated the risk of a compromise verdict on a lesser offense, which would have subjected Petitioner to mandatory imprisonment rather than potential civil commitment. *Cf. State v. Green*, 111 Ariz. 444, 448, 532 P.2d 506, 510 (1975) (finding no ineffectiveness for failure to request lesser-included-offense instructions where conviction on lesser offense may have required longer term of years before becoming parole eligible).

Even if counsel's decision to forgo the instructions was not a reasonable tactical choice, the Court finds there is no reasonable probability Petitioner would have been acquitted of first-degree murder had the jury been instructed on second-degree murder and manslaughter. Second-degree murder differs from first-degree murder only by the element of premeditation. For manslaughter, it must be shown that the death occurred "upon a sudden quarrel or heat of passion." A.R.S. § 13-1103(A)(2) (West 1978 & Supp. 1983-84).

The State presented persuasive evidence that the victim was alive when Petitioner went out to buy two knives and that she had been gagged prior to being killed. This alone

---

[12] The not-guilty-by-reason-of-insanity plea option was repealed in 1993 and replaced with the verdict of guilty except insane. A.R.S. § 13-502 (West 2001). Under this defense, if a defendant establishes insanity, he is subject to mandatory commitment at a secure mental health facility in accordance with A.R.S. § 13-3994.

refutes any argument that the death occurred as the result of a sudden quarrel or heat of passion.  Evidence further established that, prior to being released on furlough with his mother, Petitioner deliberated on obtaining her assets.  In addition to the will codicil proposing to immediately transfer the victim's assets in exchange for shares in Petitioner's business, Petitioner wrote a letter found in his prison cell that purported to be from his mother:

> Robert that is why I wrote you about trading shares of stock in your corp. for the 2 houses & the lots, also the jewelry & why I rewrote my will in front of you.  Any one of these people can be in on my nightmare.  I follow their ways just to stay alive.  This is why I did all those legal things down there and had you send in a money order to file the land deeds and why I transferred cash to RMH Enterprises, Inc., Moormann's Mailing Services and your personal acc.  Use the money to get your life straightened out.

(Dkt. 62, Ex. OO.)  That Petitioner's "plan" did not appear to be well thought out (and was perhaps the product of a diminished mental capacity) did not lessen its value as proof of intent and premeditation.  These documents, combined with Petitioner's meticulous dissection of the victim, attempt to eliminate her identification by flushing her fingers down the toilet, desire to see a lawyer the morning of her death, and evidentiary refutation of his claim that her suffocation was accidental, negate any likelihood that the jury would have found premeditation rebutted by evidence of Petitioner's impulsive character trait.  *Cf. Clabourne*, 64 F.3d at 1382 ("It is one thing for psychiatrists to say, as they did in *Vickers*, that the defendant has an organic brain disorder, may have been suffering a seizure at the time of the murder and was given to violent episodes in which he lost control over his actions; it is quite another to say only that the defendant may not have premeditated his actions because he is impulsive.")  Because Arizona does not recognize diminished capacity as a defense, the evidence at trial left the jury with "only two rational options: a conviction of first-degree murder, or a verdict of not guilty by reason of insanity."  *Id.*

Petitioner has established neither deficient performance nor prejudice from counsel's decision to forego lesser-included-offense instructions.  This failure, together with the Arizona Supreme Court's conclusion that Petitioner was entitled to waive lesser-included-

1   offense instructions and that this decision was strategic, convinces the Court that there is no

2   reasonable probability Petitioner would have prevailed on appeal had appellate counsel

3   asserted a claim of ineffectiveness based on trial counsel's decision to forgo such

4   instructions.   Accordingly, Petitioner has failed to establish cause and prejudice for the

5   default of this claim.

6   **II.   <u>Insanity Burden of Proof</u>**

7        Petitioner argues that he was entitled to rebut, and provide final argument on, the

8   state's evidence regarding insanity.  (Dkt. 198 at 31.)  Petitioner concedes that the decision

9   to allow rebuttal and final argument to a defendant pleading insanity is "within the sound

10   discretion of the trial court."  (*Id.* at 32.)  He asserts, however, that such discretion is abused

11   if a defendant is prejudiced by the failure to provide the last opportunity to prove and argue

12   insanity.  (*Id.*)

13        At the time of Petitioner's trial, Arizona's rules of criminal procedure provided that

14   the prosecutor has the final closing argument unless the parties otherwise agree and the court

15   approves.  Ariz. R. Crim. P. 19.1(a).  In the year following Petitioner's trial, the Arizona

16   Court of Appeals acknowledged that under this rule a trial court has discretion to allow sur-

17   rebuttal testimony and closing argument for an insanity defense.  *State v. Turrentine*, 152

18   Ariz. 61, 65, 730 P.2d 238, 242 (App. 1986).  Nevertheless, review of published decisions

19   since then reveal strong deference to a trial court's decision to deny final closing argument

20   to the defense.  *State v. Moody*, 208 Ariz. 424, 468-69, 94 P.3d 1119, 1163-64 (2004); *State*

21   *v. Jensen*, 153 Ariz. 171, 180, 735 P.2d 781, 790 (1987); *State v. Zimmerman*, 166 Ariz. 325,

22   329, 802 P.2d 1024, 1028 (App. 1990).

23        Petitioner asserts that the prosecutor misled the jury during closing argument about

24   the neurological conclusions reached by Dr. Buchsbaum.   However, the prosecutor's

25   statements with regard to Dr. Buchsbaum were not inaccurate or misleading.  In closing,

26   defense counsel referred to Dr. Buchsbaum's conclusion that something must have happened

27   to Petitioner at birth to account for his low intelligence and behavioral problems (RT 4/4/85

28

at 37); the prosecution pointed out that despite this theory Dr. Buchsbaum was unable to identify any specific neurological deficits (*id.* at 47-48). (*See* ROA at 105.) This was a factually correct assertion and thus hardly prejudicial.

Petitioner also complains that the prosecutor told the jury that it first had to determine Petitioner's sanity before they considered whether the State had proven each element of premeditated murder. This assertion was made during the State's opening argument. (RT 4/4/85 at 2.) Thus, defense counsel could have addressed it during his closing argument.

Considering all of the circumstances, the Court concludes there is no reasonable probability Petitioner would have prevailed had appellate counsel raised this issue on direct appeal. Therefore, Petitioner has failed to establish cause and prejudice for the default of this claim.

**III.   Ineffective Assistance of Counsel at Sentencing**

Petitioner asserts that counsel was ineffective at sentencing for failing to locate records and to interview and present witnesses regarding various aspects of Petitioner's social history, including his birth parents, placement in numerous foster homes, and physical and mental impairments. (Dkt. 198 at 24, 27.) The Court disagrees and concludes there is no reasonable probability the Arizona Supreme Court would have granted relief on this claim had it been presented by appellate counsel on direct appeal.

**A.   Relevant Facts**

1.   Aggravation/Mitigation Hearing

Petitioner was convicted by a jury on April 4, 1985. Thirty-three days later, the trial court held an aggravation/mitigation hearing. In a post-sentencing request to exceed compensation guidelines, defense counsel avowed that he had spent time following the jury's verdict attempting to locate witnesses for sentencing and examining Petitioner's prison files for mitigation evidence. (ROA at 376.) Counsel did not prepare any pre-sentencing memoranda and at the aggravation/mitigation hearing presented only two witnesses. The first, Robert Palmer, was a chaplain at the Arizona State Prison. He testified that he had

known Petitioner for the previous sixteen months, spoke with him briefly at least once a month, and on a couple of occasions had more in-depth conversations. (RT 5/7/85 at 16-17.) In his view, Petitioner was a non-violent, child-like person that obeyed rules and adjusted well to institutional living. (*Id.* at 17-19.) The second witness, Wendel England, was a counselor at the state prison who had contact with Petitioner on a daily basis for almost two years prior to the offense. (*Id.* at 21, 23.) He testified similarly that Petitioner was child-like and followed institutional rules. (*Id.* at 23-25.)

Counsel also provided the judge with a packet of materials to consider with regard to sentencing. (RT 5/7/87 at 28; ROA at 332-357.) Included was a 1977 assessment by Arizona Department of Corrections (ADOC) Chief Psychologist Dr. David Biegen stating that Petitioner's adjustment to prison "has been good" and recommending him for outside trustee status. (ROA at 341.) Also included were numerous work evaluations of Petitioner by correctional officers and psychological "chrono" notes documenting on-going counseling during the several years prior to the murder. (*Id.* at 343-57.)

In addition, the packet contained several letters from individuals who knew Petitioner at various stages of his life. A 1978 letter from Dr. Jay Sitterley, written in support of a parole request, stated that he had been the Moormann family physician for numerous years and had known Petitioner since age 12. (*Id.* at 342.) Dr. Sitterley indicated:

> Basically, this young man is a mild to moderate Cerebral Palsy victim with an unspecified degree of learning disability. He has been an ingratiating person, who is subconsciously pleading for peer acceptance. The latter statement, in my opinion, forms the basis of the reasons for his incarceration at your institution. I do not believe that he would ever harm anyone.
>
> It is unfortunate, but I believe he is the product of our society in that he has been largely rejected by that society. This leaves him with a certain degree of emotional frustrations.

(*Id.*) In a 1983 letter, Elizabeth Baker stated that Petitioner was not a problem during the months he lived at her boarding house prior to his parole revocation and offered to provide room, board, and transportation to mental health experts if Petitioner were re-released on parole. (*Id.* at 338.)

Most notably, Dr. Ivernia Tyson, a professor at Northern Arizona University who taught Petitioner from 1957 to 1959, provided background on Petitioner's youth.  She had taken great interest in Petitioner as a child and stated that he "was an unwanted baby born into an unfriendly world."  (*Id.* at 333.)  In a detailed submission written after Petitioner's murder conviction, Dr. Tyson described Petitioner's physical impairments and social rejection at the various schools he attended.  She included a report from Dr. Carl Breitner, who had evaluated Petitioner when he was in the fifth or sixth grade.  Dr. Breitner believed that Petitioner was not psychotic, that he was more emotionally stable than would be expected given his traumatic upbringing, and that "his impulsive acts with knives and scissors should [not][13] be taken too seriously."  (*Id.* at 336.)

At the conclusion of the aggravation/mitigation hearing, defense counsel asked the court to "take into account the matters concerning Mr. Moorman's mental defects, his psychological and psychiatric background, all of the matters which were raised by the Defense concerning the insanity issue in this case, and any other mitigating evidence which came out during the course of the trial."  (*Id.* at 27.)  Counsel's presentencing argument, which comprises three-and-a-half pages of transcript, focused primarily on the alleged aggravating factors.  (*Id.* at 30-32.)  With regard to mitigation, counsel stated only that there had been a "fight" and a "problem" between Petitioner and his mother, that the killing did not warrant the death penalty, that Petitioner could be a productive person in prison, that Petitioner was not a violent individual, and that Petitioner's medical, psychological, and psychiatric records established that he was mentally incompetent and not the type of person that could plan and premeditate a murder.  (*Id.* at 32-33.)

---

[13]     In the context of Dr. Breitner's report, it appears the word "not" was inadvertently omitted from this statement.  Although the report does not elaborate on Petitioner's impulsive acts involving knives and scissors, Petitioner told Dr. Hazlehurst that he was sent to a detention center for boys after being found in possession of a knife at school. (1972 PSR, Hazlehurst Rpt. at 1; *see also* Dkt. 146, Ex. 14 at 3 (declaration of Dr. Gerald Knowles).)

1          2.      1985 Presentence Report

2          At the aggravation/mitigation hearing, the trial court stated that it had reviewed a

3   presentence report (PSR) prepared by its probation department.[14]  *See* A.R.S. § 13-703(C)

4   (1978) (repealed Laws 1999, Ch. 104, § 1).   The PSR provided a brief overview of

5   Petitioner's family background:

6          There is some suspicion that the defendant's mother died while the defendant
           was at an early age and that his grandfather assumed custody.  There is further
7          suspicion that due to a difficulty with alcoholism by the grandfather that the
           defendant was submitted for adoption.  When the defendant was approximately
8          two and one half years of age he was adopted by Henry and Roberta
           Moormann.  Prior to their adoption of the defendant the defendant was placed
9          in three to four different foster homes.

10  (ROA at 319.)  The report noted that Petitioner was twice sent to a juvenile correctional

11  facility, the last resulting from a charge of child molesting when he was 17 years old, and that

12  while a juvenile he was referred to a special school following the allegedly accidental

13  shooting of his mother.  (*Id.* at 317.)  It further stated that Petitioner's adoptive father died

14  when Petitioner was 19 years old.  (*Id.* at 319.)

15         With regard to Petitioner's personal development, the PSR stated:

16         A psychiatric examination of the defendant conducted in 1972 by Dr.
           Harrison Baker indicates that at that time the defendant characterized his early
17         development as being a positive experience.   The defendant identified
           experiencing a very close relationship with his father and identified his
18         relationship with his adoptive mother as being over protective and
           infantalizing.  It should be noted that references have been made in police
19         reports in the current offense that the defendant has indicated a possible history
           of familial sexual abuse.  This information however cannot be verified through
20         other sources.  The defendant was described by his parents at that time as
           being obsessed with sex and as being a pathological liar since an early age.
21
22  (*Id.* at 319-20.)  The report also noted that Petitioner had difficulty in school and was labeled

23  as being a poor achiever and mentally retarded. (*Id.* at 320.)  It further stated that Petitioner

24  had a long term history of mental health difficulties but appeared to be free of psychotic

25  _____

26         [14]      The PSR was provided to this Court by the Arizona Supreme Court.  (*See* Dkts.
           138, 155.) It is also reproduced in Volume 2 of the Record on Appeal provided to this Court
27  by the Pinal County Superior Court.  (*See* ROA at 315-31; Dkt. 74.)

28                                              - 31 -

disorder at the time of the offense.  (*Id.*)  In conclusion, the PSR stated:

> It could be speculated that the defendant's mental health difficulties resulted from an unstable family background and it could be further speculated that the current offense resulted primarily from familial dynamics.  This officer would contradict that position in that this officer does not perceive the defendant's propensity for violence as being limited in direction to family members.  This is indicated by the defendant's previous conviction for kidnapping and by his background as a juvenile.

(*Id.* at 321.)

In an addendum to the PSR, the probation officer included the following statement

from Petitioner regarding the offense:

> What the County Attorney said on his closing argument was a bunch of B.S.  If I ever wanted money from my mom all I had to do was ask her.  I always ended up with what I needed.  I was in favor of her going to Oklahoma.  That's where her family was.  I didn't want to go back to Flagstaff.  I am willing to take a lie detector test.  Some of what I said on the night I confessed was the truth but part was not.  I had been dealing with the cops and doctors in the past but nobody ever wanted to listen.  I decided to tell them what they wanted to hear but not what really happened.  That night there was nothing premeditated or intentional about what happened.  Mom and I had been having an affair for years.  That night I accidentally hurt her.  I just put the pillow over her head to knock her out not to kill her.  Before dad became a taxi cab driver he studied to become a doctor.  One night when mom was having a really bad time I saw dad put the pillow over her head.  Later he explained to me that you could use a pillow to knock someone out without hurting them.  That was the only reason I did it, to help her, not to hurt her.  When I removed the pillow she was making sounds like she was alright.  I left to take a walk and when I came back I tried to wake her up but her body felt funny and I found she was dead.  I wish I could take a lie detector test.
>
> I wish I could undo what happened.  I can't blame my family for feeling the way they do.  I don't think I should die or spend the rest of my life for something that was accidental.  I think I should be punished for lying to the police and for being for some way responsible for mom's death, though it was not premeditated or intentional.

(*Id.* at 331.)

Finally, several letters urging the Court to impose the death penalty were attached to

the PSR.  The first, from Petitioner's cousin (the victim's nephew, whom Petitioner asserts

was a prominent member in their Flagstaff community), claimed that Petitioner had inflicted

physical and psychological pain on the victim most of his life, had threatened to kill the

author on several occasions, and had stolen funds once from his father's business.  (*Id.* at

323-24.)  The writer continued:

> For as long as I can remember, [Robert Moormann] has used terror and deception as means of gaining personal ends, leading to such incidents as choking attacks on smaller, younger relatives, lying to his mother about having a terminal illness and tormenting her for months with that lie, and, then, to the kidnapping and molestation of an eight-year-old daughter of longtime family friends.

> At age 14, he deliberately shot and painfully wounded his adoptive mother.  To the day he killed this good, tragic woman, she carried in her liver a bullet that she took in that incident.

> For the most part, he always has escaped paying any severe penalty for his actions because people foolishly took pity on him, or so respected his adoptive parents that they would not "push" the matter once it had been discovered and stopped.  Also, the defendant, himself, managed to convince many of us, myself included, that he had mental problems in the area of retardation, and that this was a valid excuse for his constantly anti-social, erratic behavior.  As a result, he went blissfully from one crime to another, always showing an increasing tendency to worse violence and blatant cruelty.

(*Id.* at 324.)

The second letter was signed by the victim's siblings.  It states in no uncertain terms their belief that Petitioner premeditated the murder.  (*Id.* at 326.)  The final letter was prepared by a long-time friend and administrator of the Moormann estate.  He expressed fear that, if released, Petitioner would seek revenge for being "cheated" out of his mother's estate. (*Id.* at 328.)

3.     1972 Presentence Report

The sentencing judge also reviewed the PSR prepared for Petitioner's 1972 conviction for kidnapping while armed with a deadly weapon and subsequent probation revocation in 1979.[15]  The PSR described the offense:  Petitioner kidnapped the eight-year-old daughter of a family friend at gun point and over the next two days drove her to several motels around Arizona, forced her to perform fellatio numerous times, and eventually turned himself and her into a Las Vegas police department.  Petitioner apparently told the young girl that he

---

[15]     The PSR from Petitioner's 1972 kidnapping conviction was included in the state court record provided to this Court by the Arizona Supreme Court.  (*See* Dkt. 155.)

- 33 -

1   wanted to marry her.  Appended to the PSR were various psychiatric, psychological, and

2   medical reports of Petitioner.

3       Dr. Norman Duley, a psychiatrist who had examined Petitioner numerous times prior

4   to the kidnapping, described Petitioner as having a long history of mental disturbance.  He

5   first examined Petitioner at age 18 and noted in his background history that Petitioner had

6   been a problem in school and was characterized by his parents as being obsessed with sex

7   and a pathological liar.  At that time Petitioner was taking Dilantin, an anti-convulsant

8   medication, as well as Sparine, a major tranquilizer; both had been prescribed by the Arizona

9   State Hospital several years earlier based on their impression that Petitioner was epileptic.

10  The anti-convulsant was discontinued after further evaluation by a neurological institute

11  found no evidence of epilepsy.  Dr. Duley changed the Sparine to Mellaril and observed that

12  Petitioner experienced "fewer sexual impulses toward little girls although he still thought a

13  great deal about sex and masturbated almost daily."  (1972 PSR, Duley Rpt. at 1.)

14  Subsequently, Petitioner's father died and Petitioner's behavior "seemed to settle down."

15  (*Id.*)

16      Although Petitioner continued a pattern of running away and then returning home, Dr.

17  Duley believed Petitioner continued taking the Mellaril and was able to control his

18  obsessions about little girls.  Several months before the kidnapping, Petitioner went to

19  Phoenix to see a former girlfriend.  After learning she had a boyfriend and was living in

20  Tucson, he had sex with a prostitute and consequently contracted a sexually-transmitted

21  disease.  Shortly thereafter, Petitioner became impotent and stopped taking the Mellaril

22  because he believed it was the cause.  This apparently led to an increased obsession with sex,

23  and Petitioner regularly sought to pick up Native American women who resided on nearby

24  reservations.  About a week before the offense, Petitioner learned that his former girlfriend

25  was planning to get married.  He became depressed and contemplated suicide, then resolved

26  to abduct a woman.  He considered various individuals, including the victim's mother, and

27  ultimately chose the child on impulse.  Dr. Duley diagnosed Petitioner as suffering from mild

28                                      - 34 -

mental retardation associated with pedophilia.

Dr. George Hazlehurst, a psychiatrist, also examined Petitioner to determine if he was competent for trial on the kidnapping offense.  Petitioner relayed his varied institutional stays:  he spent a month at the Arizona State Hospital when he was 13 years old after accidentally shooting his mother, some years at a special needs school in Phoenix, and two terms at a detention center for boys – once for having a knife at school and once for molesting a girl.  Petitioner also described experiencing blackouts, which were investigated when he was at the state hospital and again when he was 20 years old, but no definite conclusions were reached and the latter tests were reported as normal.  Petitioner enjoyed talking about sex with little girls, but denied ever going beyond talking.  Dr. Hazlehurst concluded:

> He is in good contact and there is no evidence of hallucinations or delusions currently.  Thinking processes are fairly well organized at present, but appear to have been quite disorganized and fragmented before and during the escapade.  Intellectual functions are chronically impaired, though of mild degree, and memory is poor for dates, and absent for the periods of blackout.  Judgment seems impaired, reasoning is immature and child-like, and competency is generally borderline.  Also, insight is poor.

> In view of the longstanding difficulty with learning, the recurring behavioral disturbances, and the inability to function other than in the simplest jobs, it is evident that Mr. Moorman is mentally deficient.  This condition, as often happens, is coupled with recurring behavioral reactions, and in this case I suspect that the reaction took on psychotic proportions.  There may also be underlying brain damage with psychomotor epilepsy, as mentioned.

> Diagnoses: Mental deficiency, mild, with behavioral, and possibly psychotic, reaction.  Possible psychomotor epilepsy.

> Mr. Moorman is able to understand the charges against him and is able to assist counsel in his defense.

(1972 PSR, Hazlehurst Rpt. at 3.)

Following the examinations by Drs. Duley and Hazlehurst, Petitioner was sent to the Arizona State Hospital for further evaluation.  Psychologist Donald McGuirl administered numerous tests and determined that Petitioner was not mentally retarded.  On the Wechsler Adult Intelligence Scale, Petitioner achieved a full-scale IQ of 86 – within the dull-normal

range of intellectual performance.  Furthermore, Dr. McGuirl observed that there was evidence of "a basic intellectual potential falling in the average range.  Current anxiety and situational depression served to depress his overall intellectual efficiency and prevented him from achieving a more adequate overall rating."  (1972 PSR, McGuirl Rpt. at 1.)  Dr. McGuirl further observed:

> Other test data revealed that the patient possesses a greater number of personality resources than are immediately obvious.  He is capable of introspection and can see the environment in realistic terms.  There are no indications of an ongoing schizophrenic nor organic process.  However, he is clearly very immature emotionally and suffers from intense dependency needs.  Furthermore, his sense of personal responsibility is quite restricted, possibly due to excessive indulgence and/or overprotection in the past.  It appears as though significant others have preferred to see him as incompetent and inadequate and that he has learned to exploit these views to avoid personal responsibility of his actions and the development of independence.

(*Id.*)

Dr. Harrison M. Baker, a psychiatrist at the state hospital, conducted a neuro-psychiatric exam and concurred with Dr. McGuirl's conclusions.  He stated that Petitioner initially claimed to have had a history of blackouts and was unable to recall the abduction, but subsequently admitted these were lies and provided minute detail about the kidnapping.  Dr. Baker observed "no indication of mental retardation, organic brain disease or evidence of psychosis.  There was no indication of delusions, illusions, or hallucinations, although the man does have a rather vivid imagination."  (1972 PSR, Baker Rpt. at 2-3.)  He diagnosed Petitioner as without mental disorder but with pedophilia.  Dr. Baker also noted that skull films, brain scan, and lumbar puncture were normal.  An electroencephalogram revealed an abnormal wave pattern compatible with epilepsy, but the lack of seizure history and Petitioner's admission that his blackout claims "were deliberate lies in an attempt to avoid the possibility of prosecution" negated an epilepsy diagnosis.  (*Id.* at 3.)

Lastly, the 1972 PSR contained a report by a psychiatric social worker at the state hospital.  She stated that Petitioner described "a curiosity about sex from an early age, and of being known to Flagstaff Police because of a penchant for annoying young girls by

1   approaching them sexually." (1972 PSR, Wittleder Rpt. at 1.)  Her report noted Petitioner's

2   multiple physical problems, including a hernia condition, nasal defect, and speech and visual

3   difficulties, all of which contributed to his pattern of dependency.  She further stated that

4   Petitioner openly discussed the abduction and, when caught in discrepancies, "naively

5   explained it away as it's being what his attorney has advised." (*Id.* at 2.)

6        4.    Sentencing

7        Immediately following counsels' arguments during the aggravation/mitigation

8   hearing, the court imposed sentence.  In aggravation, the sentencing judge found three

9   aggravating factors proven beyond a reasonable doubt:  (1) Petitioner had previously been

10  convicted of another offense punishable by life imprisonment, A.R.S. § 13-703(F)(1); (2) the

11  murder was committed for pecuniary gain, A.R.S. § 13-703(F)(5); and (3) the murder was

12  committed in an especially heinous, cruel, or depraved manner, A.R.S. § 13-703(F)(6).  (RT

13  5/7/85 at 34-35.)  The latter finding was based on the lacerations and bruises inflicted on the

14  victim prior to death.  With regard to mitigation, the Court found, pursuant to A.R.S. § 13-

15  703(G)(1), that Petitioner's capacity to appreciate the wrongfulness of his conduct or to

16  conform his conduct to the requirements of the law was significantly impaired.  (*Id.* at 36.)

17  It further found that this mitigating factor was not sufficiently substantial to call for leniency

18  and sentenced Petitioner to death.  (*Id.*)  Without elucidation, the Arizona Supreme Court on

19  direct appeal agreed that the one mitigating factor did not outweigh the aggravating

20  circumstances.  *Moorman*, 154 Ariz. at 587, 744 P.2d at 688.

21     **B.    Analysis**

22       Under *Strickland*, the right to effective assistance of counsel applies not just to the

23  guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v.*

24  *Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d at 1378).

25  With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a

26  defendant challenges a death sentence . . . the question is whether there is a reasonable

27  probability that, absent the errors, the sentencer . . . would have concluded that the balance

28                                          - 37 -

of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695.

Petitioner alleges that defense counsel failed to interview family members, neighbors, fellow students, former doctors, teachers, and foster families, and failed to gather social, family, and criminal justice records. (Dkt. 198 at 24-25.) Petitioner further argues that had counsel undertaken an exhaustive social history investigation, he would have uncovered evidence that Petitioner's mother "had in fact sexually abused Petitioner throughout his life and that the abuse continued on the night of her death, and caused the events that occurred." (*Id.* at 26.) This, Petitioner urges, is the most "compelling and relevant" issue to sentencing, and he argues that counsel was ineffective for labeling the abuse a delusion "in the face of expert opinions and easily-discoverable historical evidence of its credibility." (Dkt. 200 at 22.)

### 1.    Newly-proffered Evidence

In support of his claim, Petitioner has proffered a wide array of documents. These include declarations from physicians who treated Petitioner in his youth, mental health experts who evaluated and treated Petitioner as a young adult and in prison, and mental health experts who evaluated Petitioner during these habeas proceedings. Petitioner also has submitted records relating to his birth mother, declarations from lay witnesses, school records, medical records, and adoption-related records and correspondence.[16]

### Birth mother

According to records proffered by Petitioner, his maternal grandparents divorced when his birth mother, Joann La Bonte, was 11 years old. (Dkt. 146, Ex. 23.) In January 1946, at age 14, Joann ran away from home in California and was arrested several months

---

[16]      Petitioner also submits declarations from four jurors – two state they would have convicted of a lesser offense had they been given the opportunity and all state their belief that the death penalty is inappropriate in this case. (Dkt. 154, Exs. A-D.) In addition to lacking relevancy, the declarations impermissibly delve into the jurors' deliberative process. Therefore, the Court has not considered them in evaluating any of Petitioner's claims. *Tanner v. United States*, 483 U.S. 107, 120-27 (1987).

1    later in Seattle, Washington, after being caught in a vehicle having sexual intercourse. (Dkt.

2    146, Ex. 24.)  She was returned to her mother's custody in California and subsequently had

3    a miscarriage. (Dkt. 146, Ex. 25.)  Feeling she had no control over Joann, her mother

4    petitioned the juvenile court for custodial placement. (*Id.*)  A psychological evaluation

5    conducted by a court-appointed expert concluded that she had low intelligence and uncritical

6    thinking. (*Id.*)  Joann was made a ward of the court and placed at a convent for just over a

7    year. (*Id.*)  In August 1947, she moved to Tucson to live with an aunt and within four

8    months got pregnant and married Robert Conger. (*Id.*)

9           Adoption and foster care

10          Proffered records state that Petitioner was born in June 1948. (Dkt. 146, Ex. 27.)  One

11    year later, his mother sought to place him with Catholic Social Service. (*Id.*)  In interviews

12    with a case worker, Joann relayed that her husband left her when the baby was two months

13    old. (*Id.*)  She initially placed her son in a boarding home in Tucson, retrieved him for a

14    short period after moving to Phoenix, and then put him in a boarding home in Phoenix. (*Id.*)

15    She expressed interest in placing her son for adoption and also stated that he was born with

16    club feet but was learning to walk with braces. (*Id.*)  The caseworker agreed to contact her

17    estranged husband to inquire about possible reconciliation and/or adoption for the baby. (*Id.*)

18          Concerned about the baby's physical well being, a caseworker went to the Phoenix

19    boarding home to check on Petitioner and took him to the Crippled Children's Hospital for

20    an examination. (*Id.*)  The foster family reported that Petitioner was a good baby that rarely

21    cried; that his mother had dropped him off with just a couple of diapers and no clothes,

22    bottles, or feeding instructions; and that his mother had visited only once for five minutes.

23    (*Id.*)  The medical exam revealed that Petitioner was not club footed but had very flat feet

24    and likely needed arches in his shoes. (*Id.*)

25          In July 1949, one month after contacting Catholic Social Service, Joann was critically

26    injured after diving into a shallow part of a lake and died two weeks later. (*Id.*)  After her

27    death, her father and step-mother sought to adopt her one-year-old son and apparently bought

28                                              - 39 -

a new home with Petitioner's inheritance. (*Id.*)  Less than a year later, at the behest of a county investigator, Catholic Social Service filed a neglect petition against Petitioner's grandparents and in June 1950 placed him in the boarding home of Blanche Myers. (*Id.*)  A psychological evaluation conducted three months later stated that his grandparents' petition to adopt had been denied because of marital difficulty and drinking. (*Id.*)  It further reported that during the 11 months he was with his grandparents, his grandfather had no contact with him, his grandmother showed little interest, and he was not toilet trained. (*Id.*)  In addition, he was malnourished and emotionally neglected, and reacted to those conditions with temper tantrums and masturbation.  (*Id.*)  After three months in the Myers's home, Petitioner overcame his initial fears and developed an attachment to his foster father.  "His temper tantrums are less frequent and masturbation stopped after first few weeks, but reoccurred last week (possibly caused by several things – foster father met with accident and was hospitalized all week, foster mother spent considerable time at hospital, Tommy – 7 year old child started to school)." (*Id.*)  Finally, the report noted that Petitioner played well with other children, was very affectionate, and, although he spoke little, did so in complete sentences. (*Id.*)  In a declaration, Blanche Myers states that Petitioner had many problems and was emotionally disturbed. (Dkt. 146, Ex. 19 at 2.)  She described him as clumsy and awkward, a boy who had trouble keeping his balance and who masturbated when he became upset. (*Id.*)

Petitioner was placed with the Moormanns in December 1950, when he was two-and-a-half years old, and their petition for adoption was finalized in July 1952. (Dkt. 146, Exs. 28, 29.)  An August 1953 letter from Catholic Social Service to the juvenile court requesting dismissal of the custody petition states: "The child has adjusted well and is very secure and happy.  The adoptive parents have been very conscientious in carrying out their parental duties."  (Dkt. 146, Ex. 28.)

<u>School years</u>

With regard to his school years, Petitioner has proffered a declaration from Ray

Raudebaugh, who states that he attended the same elementary school as Petitioner. (Dkt. 146, Ex. 20 at 2.) Although he knew very little about Petitioner and had no contact with him after the sixth grade, Raudebaugh states that Petitioner was "quite visible at school" because he was thin, had either buck teeth or a pronounced over-bite, and wore thick glasses. (*Id.*) He says Petitioner did not fit in, tried too hard to be accepted, and had no friends. (*Id.*)

One of the administrators at Petitioner's elementary school recalls that Petitioner had fairly severe learning disabilities, a short attention span, and some behavioral problems. (Dkt. 146, Ex. 13 at 1-2.) He failed the majority of his classes but was nonetheless promoted each year to the next grade. (*Id.*; Dkt. 146, Ex. 31.) Dr. Ivernia Tyson worked hard with Petitioner and was a positive influence on him. (Dkt. 146, Ex. 13 at 3.)

Petitioner has further provided a declaration from his sixth grade teacher, Dr. Gerald Knowles, who also testified on Petitioner's behalf following the 1972 kidnapping charge. (Dkt. 146, Ex. 14 at 9.) Dr. Knowles describes Petitioner as a social outcast – with thick glasses, an unsightly mole on his face, a nearly-shaved head, an ungainly walk, and a stuttering/drooling problem. (*Id.* at 2.) He relays an incident that occurred while Petitioner was in the fifth grade, during which he held a pair of scissors up to the light. At the time, his teacher feared it was a potentially violent act, but Dr. Knowles now believes it was because Petitioner was visually impaired and attempting to see the glint caused by the sun's reflection. (*Id.* at 3.) Dr. Knowles also states that Petitioner had profound learning disabilities, a limited attention span, and severe panic attacks. He further relays that much of the information regarding Petitioner's history was uncovered by Dr. Tyson, who was an advocate for Petitioner. (*Id.* at 5.)

With regard to Mrs. Moormann, Dr. Knowles declares that he saw "fear, anxiety, and agitation" whenever Petitioner spoke about his mother. (*Id.* at 4.) He also describes her as being a "stand-offish" and "rough quality" woman who wore a lot of make up and smoked excessively:

Roberta Moormann was at once both very (perhaps overly) involved with her

1   son and secretive about him.  She did not seem to trust anyone who came into
    contact with her son.  When she spoke of him or discussed his background, I
2   always had the feeling that she was not telling the entire story.  Nonetheless,
    she and her son had obviously developed a very strong bond.  Whenever I saw
3   Bob outside of school, he was in the company of his mother.

4   (*Id.* at 8.)

5       Petitioner also has obtained a declaration from Estella Kincannon, who worked

6   closely with Dr. Ivernia Tyson at a clinic for children with physical and emotional

7   difficulties. (Dkt. 146, Ex. 17 at 1.)  She asserts that she first met Petitioner around age eight,

8   when Mrs. Moormann brought Petitioner into the clinic.  (*Id.*)  Petitioner was "a sweet boy

9   with a very round face and very thick glasses.  He always behaved himself, but there was

10  clearly something quite wrong with him."  (*Id.*)  She believes Petitioner suffered from some

11  form of cerebral palsy, but acknowledged not knowing whether his condition was ever

12  properly identified. (*Id.* at 1-2.)  According to Ms. Kincannon, Dr. Tyson took special efforts

13  to help Petitioner, arranged for specialists to evaluate him, and attempted to learn more about

14  the first years of his life.  (*Id.* at 2.)  She also states that Dr. Tyson had a fine relationship

15  with Petitioner's parents and lived near them.  (*Id.*)  Finally, she notes that Petitioner's

16  mother was both protective and secretive concerning Petitioner, that Petitioner spent a lot of

17  time with his father camping and fishing, but that around town Petitioner was usually with

18  his mother.  (*Id.* at 3-5.)

19      In July 1962, shortly after Petitioner turned 14, his father wrote to Catholic Social

20  Service looking for help in finding a school for Petitioner.  The letter states:

21          . . . He is mentally retarded and even tho [sic] he has been passed to the
            eighth grade it is on a social level only.
22
            I am trying to find a school for mentally retarded children in this part
23          of the country.

24          It would be deeply appreciated if you could help me.  He has been
            getting in a little trouble with the Juvenile authorities and they want to send
25          him to Fort Grant.  I do not feel that this is the place for him.  He needs mental
            help.  Unless I can find some place I'll have to go along with them and Fort
26          Grant won't help him.

27  (Dkt. 146, Ex. 32.)  Petitioner's father died five years later in 1967. (Dkt. 146, Ex. 17 at 5.)

28                                      - 42 -

1

Family physicians

2    Dr. Hugh Dierker states that he assisted in a hernia operation on Petitioner in 1961

3  during which a "slightly raised, brown, hair-bearing" mole was removed from the side of

4  Petitioner's face.  (Dkt. 146, Ex. 6 at 1.)   He further declares that it "was generally

5  understood within the community that Robert Moormann was not a normal child" and was

6  considered "strange."  (*Id.* at 1-2.)  Dr. Dierker also states that he was never contacted by

7  Petitioner's defense counsel but, according to a message slip found in counsel's files, Dr.

8  Tyson apparently gave Dr. Dierker's name to counsel.  (*Id.* at 2.)  Dr. John Kahle also

9  assisted during the 1961 hernia operation and treated Petitioner in 1972 for gonorrhea. (Dkt.

10 146, Ex. 12.)  In reviewing the 1961 hospital records, Dr. Kahle states that the "only aspect

11 of the procedure which strikes me as possibly irregular is the fact that the patient's left

12 testicle was described as quite enlarged and dark in color; however, it could be an ordinary

13 post-operative effect."  (*Id.* at 2-3.)

14

1972 Evaluators

15    Dr. Duley, a psychiatrist who treated Petitioner for five or six years starting around

16 age 18 and evaluated him following his arrest for kidnapping in 1972,  states that Petitioner

17 was "not entirely happy about the degree to which [his mother] controlled him" but that he,

18 Dr. Duley, was "not personally aware of such behavior (sexual abuse) within the Moormann

19 household." (Dkt. 146, Ex. 7 at 3-4.)  With regard to Petitioner's evaluation by the Arizona

20 State Hospital at his request, he concludes Petitioner did not receive the type of neurological

21 work-up he believed was necessary to rule out epilepsy.  (*Id.* at 10.)  Finally, after reviewing

22 "30 years of evaluations and diagnoses" provided by federal habeas counsel, Dr. Duley notes

23 that Petitioner "has apparently posed significant diagnostic difficulties throughout his life"

24 due to "a range of conditions and impairments which were medical, psychiatric and cognitive

25 in nature." (*Id.* at 5-6.)  Dr. Hazlehurst, who worked closely with Dr. Duley, declares that

26 they "were both shocked by the [1972] report of Dr. Harrison Baker [at the Arizona State

27 Hospital], who appeared to give Mr. Moormann a clean bill of health." (Dkt. 146, Ex. 11 at

28

1   4.)  He also noted that it was "extremely difficult to identify a single diagnosis which fully

2   and accurately explained [Petitioner's] behavior and the range of his symptoms."  (*Id.* at 6.)

3            ADOC mental health professionals

4            Dr. David Biegen, the ADOC Chief Psychologist who evaluated Petitioner in 1977

5   and declared him fit for outside trustee status, states in a declaration that at the time of the

6   examination, staffing and resources at the state prison were insufficient to provide

7   meaningful psychological treatment, that his recommendation meant only that he found no

8   hallucinations or delusions that would undermine Petitioner's exercise of judgment or desire

9   to follow instructions, and that the purpose of the exam was not to treat Petitioner.  (Dkt. 146,

10  Ex. 3 at 1-3.)  He further states that at the time he examined Petitioner, Post-Traumatic Stress

11  Disorder (PTSD) was not yet a recognized diagnosis.  (*Id.* at 5.)

12           Dr. Rodolfo Campos, a former psychiatrist at ADOC, states that he met Petitioner

13  shortly after Petitioner was sentenced to death.  He notes that "much is unknown about the

14  first two years" of Petitioner's life other than he was given up for adoption, left with

15  alcoholic grandparents, and then placed in a series of foster homes.  (Dkt. 146, Ex. 4 at 1.)

16  He states that Petitioner reported being sexually abused by his mother starting at age 7,

17  telling his father about the abuse at age 16, and being told by his father to keep the incest a

18  secret.  (*Id.* at 2.)  Dr. Campos also notes that non-combat-related PTSD was not applied as

19  a diagnosis by clinicians until the late 1980s.  (*Id.* at 4.)

20           Dr. Ram Gopalan, a former ADOC psychiatrist who treated Petitioner from 1989

21  through 1991, declares that he diagnosed Petitioner as suffering from PTSD and Avoidant

22  Personality Disorder.  (Dkt. 146, Ex. 10 at 2.)  Petitioner often discussed the sexual abuse he

23  suffered at the hands of his adoptive mother.  According to Dr. Gopalan: "[Petitioner's]

24  reports were consistent over time.  They sounded totally plausible and they were consistent

25  with the symptoms [of PTSD] he exhibited. . . .  It was my impression that at that time, Mr.

26  Moormann was not so much psychotic as he was deeply depressed."  (*Id.* at 1-2.)

27

28                                        - 44 -

1  Habeas experts

2      Following initiation of these federal habeas proceedings, several experts evaluated

3  Petitioner.

4      *Dr. Karen Froming*

5      Dr. Froming, a neuropsychologist, examined Petitioner for the purpose of identifying

6  or ruling out general and specific cognitive deficits.  She does not provide a specific

7  diagnosis but states generally that Petitioner has "suffered multiple, chronic, disabling

8  organic impairments either since birth or immediately thereafter.  These include cognitive,

9  sensory, memory, attentional and motor deficits, which effectively thwarted his development

10  on a very fundamental level." (Dkt. 146, Ex. 8 at 60.)  In her opinion, Petitioner's "organic

11  and psychiatric disabilities resulted in, at numerous points during his adolescence and

12  adulthood, dissociative episodes and psychotic thinking"; his impairments manifested

13  themselves in increasingly delusional and thought-disordered behavior in the months prior

14  to the crime; and Petitioner was likely insane and unable to form the intent to kill at the time

15  of the offense.  (*Id.* at 61.)

16      Dr. Froming's conclusions are based, in part, on her belief that Petitioner's allegations

17  of sexual abuse by his adoptive mother are credible.  This credibility finding is in turn based

18  on the "affect and demeanor" exhibited by Petitioner during their face-to-face meetings in

19  1997 and the "consistency and plausibility" of his reports over time, especially in the years

20  following his murder conviction during which several ADOC doctors documented

21  Petitioner's reports of abuse and diagnosed him as suffering from PTSD.  (*Id.* at 18-21.)

22  Although direct documentation of sexual abuse is rarely available, Dr. Froming found it

23  significant that Petitioner had an enlarged testicle following his 1961 hernia operation.

24  "[T]his type of swelling in the area might be caused by physical manipulation of the boy's

25  testicles."  (*Id.* at 24.)

26      In her declaration, Dr. Froming also criticizes the 1972 neuropsychiatric evaluation

27  conducted by Dr. Harrison Baker while Petitioner was a patient at the Arizona State Hospital

28                                          - 45 -

following his arrest for kidnapping, as well as the work of Drs. Overbeck and Buchsbaum as defense experts for the instant offense. In particular, she questions Dr. Baker's failure to conduct further neurologic testing, his dismissal of Petitioner's self-reported blackout history, and his "securing" a confession from Petitioner that his reports of blackouts were "deliberate lies." (*Id.* at 39-46.)

Regarding Dr. Buchsbaum, she notes that he did not conduct a full examination, was not provided any guidance, and conducted only a cursory interview with Petitioner. (*Id.* at 47-48.) She does not, however, assert that Dr. Buchsbaum erred in concluding that further neurological evaluation was unnecessary. (*Id.* at 48 ("Whether or not Dr. Buchsbaum's reasoning was sound, the fact remains that Robert Moormann has not been properly evaluated neurologically . . . .").)

Dr. Froming's review of Dr. Overbeck's work is more critical. She ultimately agrees with his conclusion, finds admirable his review of Petitioner's early development and clinical history, and concludes that his application of then-existing diagnostic criteria was professionally appropriate. (*Id.* at 49-50, 53-54 ("I do not believe that his assessment was inaccurate.").) Nonetheless, she complains that he was not qualified to conduct an assessment of Petitioner's cognitive or behavioral functioning and that he failed to support his diagnosis with historical data or observed symptoms; in particular, she asserts that he failed to identify the nature of Petitioner's organic deficit and the delusion(s) underlying this disorder. (*Id.* at 53-55, 57-59.)

*Dr. Jon Conte*

Dr. Conte, Ph.D., a social work professor who specializes in child sexual abuse, conducted a social history assessment of Petitioner for the purpose of identifying the social, psychological, medical, familial, cultural, and developmental factors that shaped Petitioner's development. (Dkt. 154, Ex. E at 1-5.) With the exception of a lengthy critique of Dr. Harrison Baker's 1972 neuropsychiatric evaluation of Petitioner (*id.* at 123-32), Dr. Conte's declaration is primarily a narrative of Petitioner's life based on legal, adoption, school,

- 46 -

prison, and medical records.  As with Dr. Froming, Dr. Conte concludes that Petitioner's claims of sexual abuse by his adoptive mother are credible.  (*Id.* at 115-16.)  This conclusion is based primarily on Petitioner's affect and demeanor during their interview and Petitioner's consistent reports to mental health professionals over a long period of time:  to Dr. White during Petitioner's brief parole in 1979; to Drs. Tuchler, Overbeck, and Cleary prior to trial in 1985; and to numerous ADOC doctors following the murder conviction.  (*Id.* at 98-103.)

*Dr. Jack Potts*

Dr. Potts, a psychiatrist, examined Petitioner in 1997.  Although he does not offer any specific mental or psychiatric diagnosis, he does conclude – after a review of numerous documents, including the evaluations of Drs. Froming and Conte, and a four-hour interview with Petitioner – that Petitioner has suffered from multiple disabilities since childhood.  (Dkt. 168, Ex. 1 at 26.)  These include neurological and cognitive deficits, medical conditions, sensory impairments, and emotional and social handicaps.  (*Id.* at 26-27.)  "The effects of these conditions were cumulative, making accurate diagnoses and appropriate treatments extremely difficult."  (*Id.* at 27.)  Dr. Potts further notes that even if Petitioner had been provided the best care and proper parental love and support, his disabilities "would still have been quite severe, with profound effects on his social, emotional, and behavioral functioning."  (*Id.*)  With regard to the offense, Dr. Potts's conclusion mirrors that of Dr. Froming – i.e., that Petitioner was experiencing a dissociative episode, was likely insane, and was unable to form the intent to kill his mother.  (*Id.*)  Dr. Potts also asserts summarily that the mental health claims raised by defense counsel at trial could not be properly explored and presented without the testimony of a psychiatrist.  (*Id.* at 28.)

2.     Counsel's Performance

Petitioner has provided no support for the general assertion that trial counsel conducted no mitigation investigation.  Other than stating that Petitioner's mental health and good behavior in prison were the factors he believed warranted a life sentence, trial counsel's recently-prepared declaration is silent with regard to his investigation.  (Dkt. 201.)

1    Furthermore, Petitioner has not asserted, let alone demonstrated, that trial counsel's

2    investigator conducted no interviews and gathered no records relevant to mitigation.

3    Although Petitioner has not provided a more detailed declaration from trial counsel regarding

4    the scope of his investigation, it is evident from the record that at a minimum counsel and/or

5    his investigator did the following:  (1) gathered a significant number of medical and school

6    records (as evidenced by the reports and testimony of experts at trial); (2) reviewed

7    Petitioner's prison records (as evidenced by both the testimony at trial and the materials

8    submitted to the sentencing judge); (3) interviewed Petitioner's probation officer Jesse

9    Medrano (as evidenced by counsel's correspondence with Dr. Cleary); (4) interviewed

10   Elizabeth Baker (as evidenced by the recorded statement counsel provided to Dr. Cleary);

11   and (5) interviewed Dr. Ivernia Tyson (as evidenced by her written submission at

12   sentencing).

13        The bulk of the "life history" facts that Petitioner asserts were not discovered were in

14   fact known to defense counsel and considered by the judge prior to sentencing.[17]  As set forth

15   in the background section of this claim, these include the fact that Petitioner was placed in

16   various foster homes as an infant after being removed from the custody of an alcoholic

17   grandfather; that he was diagnosed at various times in his youth and adulthood as suffering

18   from cerebral palsy, epilepsy, mental retardation, depression, and possible schizophrenia; that

19   he suffered from severe vision defects, physical deformities, and learning disabilities as a

20   child; that he was institutionalized at the state hospital as a teenager and placed at special

21   education and detention center schools; and that he was treated for extended periods of time

22   with anti-psychotic and anti-convulsant medications. (Dkt. 198 at 16, 18-20.)  Both defense

23   counsel and the sentencing judge also were aware of the circumstances surrounding

24   Petitioner's 1972 kidnapping conviction, the subsequent medical evaluations and

25   _____

26        [17]    The only new historical evidence proffered in these proceedings relate
     primarily to Petitioner's birth family and the circumstances leading up to his adoption at age

27   two by the Moormanns. (Dkt. 198 at 13-15.)

28                                    - 48 -

1  commitment to the Arizona State Hospital, Petitioner's unsuccessful business ventures

2  following parole, and his later parole revocation, including parole officer Medrano's

3  suspicions about an inappropriate relationship between Petitioner and his mother. (Dkt. 198

4  at 20-21.)

5      In preparation for the insanity defense, Petitioner enlisted the aid of Dr. Overbeck, a

6  psychologist with a specialization in developmental disabilities. At trial, Dr. Overbeck, who

7  met with Petitioner on five different occasions, testified to the extensive medical history he

8  reviewed, which necessitated making a "list of every year since [Petitioner's] birth." (RT

9  4/2/85 at 20.) He detailed a series of medical reports, including a description of Petitioner's

10  organic-based behavioral problems at age two, a cerebral palsy diagnosis by a Dr. Hartner

11  in 1956 when Petitioner was seven or eight years old, institutionalization to a state hospital

12  and placement at a special-needs school around age 14, long-term treatment with

13  tranquilizers and antipsychotic medications, and recurrent problems in school both

14  behaviorally and academically (as reflected in available school records).[18]  (*Id.* at 20-27.)

15      Petitioner argues that his trial counsel and expert "refused to believe the

16  overwhelming proof that Petitioner had been sexually abused by his adoptive mother." (Dkt.

17  200 at 24.)  As explained with regard to his trial IAC claims, however, counsel sought to

18  corroborate Petitioner's allegations.  Counsel gave to Dr. Cleary, who had been appointed

19  to evaluate Petitioner as a "friend of the court" expert,[19] a copy of Elizabeth Baker's

20  _____

21      [18]      Petitioner's habeas experts acknowledge that Dr. Overbeck's review of
Petitioner's life history and experiences was "admirable" (Dkt. 146, Ex. 8 at 49) and that he

22  was able to provide a "medical road-map" of Petitioner's afflictions (Dkt. 154, Ex. E at 68).

23      [19]      The parties jointly requested and obtained appointment of a third expert to

24  determine Petitioner's mental state at the time of the offense. (ROA at 84.) The State
requested that Petitioner be seen by a doctor at the Arizona State Hospital, while defense

25  counsel sought appointment of psychiatrist David Gurland. (*Id.* at 54, 84.) The court

26  initially directed an examination by the state hospital but ultimately appointed psychiatrist
Michael Cleary after learning that the hospital was too busy to conduct the exam. (ME at 20-

27  21.)

28                                              - 49 -

1   statement declaring that Petitioner had told her that he and his mother had been sleeping

2   together since his youth.  (Dkt. 146, Exs. 50, 51.)  Counsel also relayed to Dr. Cleary

3   information that Petitioner's parole officer believed an inappropriate relationship existed and

4   subsequently provided notes from Petitioner's treating psychologist (Dr. White)

5   recommending that Petitioner and his mother remain physically separated.  (*Id.*, Ex. 46.)

6   Petitioner does not articulate clearly what additional evidence relating to the abuse

7   allegations would have been uncovered had counsel conducted further investigation into

8   Petitioner's background and childhood.  *See Ceja v. Stewart,* 97 F.3d 1246, 1255 (1996)

9   (IAC claim fails without explanation of what compelling evidence would have been

10  discovered from additional investigation).  Rather, Petitioner proffers new expert evaluations

11  that detail Petitioner's background (based in large measure on materials considered by the

12  judge at sentencing, including those contained in the 1972 and 1985 PSRs), critique the

13  evaluations of Drs. Baker and Overbeck, opine that Petitioner's abuse allegations are

14  credible, and conclude that Petitioner was likely insane at the time of the offense.[20]  (Dkt.

15  146, Ex. 8 at 61 (Froming Decl.); Dkt. 168, Ex. 1 at 27 (Potts Decl.); *see also* Dkt. 154, Ex.

16  E (Conte Decl).)  These new expert reports, prepared more than 12 years after the offense,

17  present a more thorough social history than the investigation undertaken by counsel at trial

18  or sentencing.  Nonetheless, they are insufficient to show that counsel's actions *at the time*

19  were unreasonable.

20      As already noted, Dr. Overbeck was unable to verify the nature of the relationship

21  between Petitioner and his mother and so assumed, with respect to Petitioner's report of

22  abuse, that "either one, it was valid and he was reporting it accurately, in which case we

23

24      [20]    To the extent Petitioner argues counsel was ineffective at sentencing for failing
    to present evidence or argument that Petitioner was severely mentally ill and that the victim's
25  death was accidental, that claim is procedurally barred.  *See Moormann*, 426 F.3d at 1056.
    Similarly, Petitioner's state PCR petitions are devoid of any IAC allegations based on
26  counsel's reliance on Dr. Overbeck's trial testimony as mitigation or failure to retain other
    experts for sentencing.  Consequently, those issues are not before this Court.
27

28                                    - 50 -

1    would be looking at a simple organic syndrome, or, two, I had to consider the fact that the

2    information he was giving me was either intentionally or unintentionally distorted" and thus

3    he suffered from organic delusional syndrome.  (RT 4/2/85 at 29, 74.)  Given the physical

4    evidence contradicting Petitioner's claim that he and his mother were having sexual relations

5    at the time of the suffocation, the substantial evidence of premeditation, Petitioner's

6    reputation for lying, and Dr. Overbeck's opinion that the relationship may have been the

7    product of a delusion, it was not unreasonable for counsel to focus on the alleged abuse as

8    a delusion to bolster his contention that Petitioner was suffering from an organic delusional

9    syndrome at the time of the killing and, consequently, was unable to know or appreciate the

10   nature and consequences of his conduct.[21]

11       As set forth in his first PCR petition (no sentencing-related IAC claims were raised

12   in the second PCR petition), Petitioner's sentencing IAC claim rests on the allegation that

13   counsel failed to allow Petitioner to testify about the abuse he suffered by his mother and

14   failed to call witnesses, such as Dr. Ivernia Tyson, who were acquainted with Petitioner's

15   background and childhood.  (Dkt. 161, Ex. KK at 9.)  *See Moormann*, 426 F.3d at 1059

16   (remanding for assessment of whether appellate counsel's failure to raise "those claims that

17   were presented in [Petitioner's] first and second PCR" resulted in prejudice).  Petitioner has

18

19   _____

20       [21]    Interestingly, one of Petitioner's habeas experts describes another of
     Petitioner's assertions – that during his time in Tucson he married a young woman named

21   Vicki Carr with whom he had at least two children (twins) – in the following manner:

22       I am aware of no records documenting this relationship, but I note that Mr.
         Moormann has repeated this story consistently for more than a decade.  He

23       spoke of the efforts he has made to locate his wife, and the frustration and
         despair he experiences with each failed attempt.  Documents confirm that he

24       has urged his attorneys – trial counsel and his current lawyers – to locate his
         wife and children.  It remains unclear whether this is in fact a sad chapter in

25       Robert Moormann's life, or a longstanding delusion.

26

27   (Dkt. 154, Ex. E at 94-95 (Conte Decl.).)

28                                        - 51 -

proffered no evidence suggesting that counsel refused to allow Petitioner to testify at sentencing; counsel's declaration is silent on this issue and Petitioner has not proffered one of his own.  In addition, trial counsel provided mitigating evidence from Dr. Tyson (the teacher whom Petitioner's new witnesses agree was his biggest advocate and who knew the most about his history) as well as family friend Elizabeth Baker.  These were considered by the sentencing judge, along with Petitioner's statement to the PSR writer.

Although defense counsel's presentation at sentencing was minimal – he presented only two witnesses at the aggravation/mitigation hearing, provided written materials from life history witnesses in lieu of live testimony, prepared no sentencing memorandum to guide the sentencing judge's consideration of the relevant evidence and law, and made no plea for leniency during oral argument – at the time of Petitioner's trial, the capital sentencing decision was made by the same judge who presided over trial, and the governing statute directed that any evidence relevant to aggravation and mitigation be considered "without reintroducing it at the sentencing proceeding."  A.R.S. § 13-703(C) (1998) (repealed Laws 1999, Ch. 104, § 1).  In addition, as recognized by a Ninth Circuit en banc decision in another Arizona capital case, "the focus of penalty-phase proceedings before [Arizona] judges has been the presentence report prepared by the probation officer, rather than evidence formally presented and tested at trial." *Summerlin*, 341 F.3d at 1111 & n.12.  The *Summerlin* court observed that "penalty-phase presentations to Arizona judges are capable of being extremely truncated affairs with heavy reliance on presentence reports and sentencing memoranda, and with formal court proceedings frequently limited to a brief argument by counsel." *Id.*

Considered in this light, the Court concludes there is no reasonable probability that, at the time of Petitioner's direct appeal, the Arizona Supreme Court would have found sentencing counsel's failure to present lay witnesses regarding Petitioner's background to be unreasonable.  Petitioner's mental condition at the time of the offense was clearly the most

significant mitigating factor.[22]  Defense counsel presented extensive background evidence at trial to support an insanity defense and asked the judge to take this evidence into account when assessing whether Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired under A.R.S. § 13-703(G)(1).  Because Arizona law at the time directed that evidence at trial be considered at sentencing without being reintroduced, it was not unreasonable for trial counsel to rely on his trial submissions in support of this significant mitigating factor, which was ultimately found by the judge to have been proven.  *Cf. Bell v. Cone*, 535 U.S. 685 (2002) (finding reasonable counsel's decision not to recall trial witnesses whose testimony in support of insanity defense also provided most compelling mitigation evidence).

In addition, had counsel chosen to emphasize the abuse allegations rather than portray them as a delusion, this would have opened the door for the prosecution to call family members as rebuttal witnesses to recount Petitioner's reputation as a compulsive liar who was obsessed with sex and young girls, and the victim's numerous efforts throughout Petitioner's childhood to get him medical and psychiatric help.  *See Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (finding no ineffectiveness where admission of mitigating evidence would have opened door to harmful rebuttal evidence).  Any attempt to "blame the victim" also may have been interpreted by the sentencer as a failure by Petitioner to accept responsibility for his actions. *Cf. United States v. May*, 359 F.3d 683 (4th Cir. 2004) (finding that defendant not entitled to credit for acceptance of responsibility where statement to

---

[22]    Establishing that a capital defendant has significant impairment to his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law under A.R.S. § 703 (G)(1) has repeatedly been found by the Arizona Supreme Court to be a substantial factor justifying a sentence of life imprisonment as opposed to death. *See, e.g.*, *State v. Trostle*, 191 Ariz. 4, 951 P.2d 869 (1997); *State v. Stuard*, 176 Ariz. 589, 863 P.2d 881 (1993); *State v. Jimenez*, 165 Ariz. 444, 799 P.2d 785 (1990); *State v. Mauro*, 159 Ariz. 186, 766 P.2d 59 (1988); *State v. Graham*, 135 Ariz. 209, 660 P.2d 460 (1983); *State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979); *State v. Doss*, 116 Ariz. 156, 568 P.2d 1054 (1977).

- 53 -

1   probation office blamed victim and tried to explain away criminal conduct).

2            3.       Prejudice

3            Even if counsel's failure to present testimony regarding Petitioner's childhood and

4   upbringing was deficient, this Court concludes there is no reasonable probability that the

5   Arizona Supreme Court would have found prejudice.

6            In assessing prejudice, the Court considers the totality of the mitigation, weighs it

7   against the aggravation, and determines whether there is a reasonable probability that the

8   sentence would have been different if the additional information had been presented.

9   *Wiggins*, 539 U.S. at 534.  Petitioner argues that defense counsel "thwarted arguably the most

10  compelling and relevant part of this tragic story, that of Petitioner's sexual abuse by his

11  adoptive mother, by labeling it a delusion."  (Dkt. 200 at 22.)  This, Petitioner argues, was

12  significant evidence that, considered with the evidence already presented, likely would have

13  made a difference in the sentencing proceeding.  (*Id.*)  While the Court agrees that sexual

14  abuse by the victim would be a significant mitigating factor, the Court does not agree that

15  the additional information counsel allegedly failed to investigate establishes "overwhelming

16  proof" of the abuse.  (Dkt. 200 at 24.)

17           Petitioner's new lay witnesses provide little in the way of corroboration of the abuse

18  allegations.  There is a statement from Petitioner's sixth grade teacher that Petitioner was

19  anxious and agitated when talking about his mother and an assertion by this teacher and

20  another witness that Mrs. Moormann was a secretive person.  (Dkt. 146, Ex. 14 at 4, 8

21  (Knowles decl.); Dkt. 146, Ex. 17 at 3 (Kincannon decl.).)  At best, this evidence reinforces

22  the conclusion reached by the experts who evaluated Petitioner before trial that he had a

23  complicated relationship with his mother.  The witnesses have offered no information

24  concerning any specific incident such that, had the information been disclosed during a

25  pretrial witness interview, trial counsel (or his expert) would have determined that

26  Petitioner's allegations of abuse were credible.

27           Although Petitioner has enlisted several new experts to opine that the abuse actually

28                                                - 54 -

occurred, the issue before this Court is not whether defense counsel failed to provide his experts with necessary background information and, if so, whether such information would have affected the weight or credibility of the experts' opinions. *Cf. Hovey v. Ayers*, 458 F.3d 892, 926-29 (9th Cir. 2006); *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002); *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999). Nor is the Court considering whether counsel was ineffective for failing to question the validity of Dr. Baker's 1972 "neuro-psychiatric" report or secure a more thorough neurologic examination of Petitioner. Moreover, these opinions primarily rely on evidence that was known to defense counsel and his expert.[23] The new experts focus on the reference to an "enlarged testicle" in the medical records from Petitioner's 1961 hernia operation, but Dr. Kahle, who assisted during the surgery, expressly stated that it could have been an ordinary post-operative effect. (Dkt. 146, Ex. 12 at 2-3.) This is hardly proof that Petitioner had been sexually abused by Mrs. Moormann.

The only other "new" evidence proffered by Petitioner that was not investigated by trial counsel are records relating to his maternal grandparents' divorce; his birth mother's juvenile delinquency, marital problems, and death; and his adoption by the Moormanns. However, this new information has no corroborating value for Petitioner's abuse allegations and, standing alone, does not amount to significant new mitigation. The fact that Petitioner's

---

[23]     These include parole officer Medrano's suspicions, Dr. White's admonition, Elizabeth Baker's statement, and Petitioner's statements to Drs. Overbeck, Tuchler, and Cleary. Petitioner's habeas experts also rely heavily on mental health assessments conducted by ADOC professionals in the years following Petitioner's murder conviction, obviously none of which was available to defense counsel or his expert at the time of trial and sentencing. Thus, while these later evaluations appear credible, the Court does not find them meaningful because their assessments of Petitioner's abuse allegations are not based on any specific information regarding Petitioner's childhood or background that counsel failed to investigate and present. Rather, their assessments rest primarily on Petitioner's demeanor and affect during post-conviction interviews, his post-conviction reports and evaluations by ADOC mental health professionals, and the consistency of Petitioner's reports over a long range of time.

1   mother was killed in a drowning incident, that he was placed in various foster homes, and

2   that his grandfather was an alcoholic who lost custody of him were all known to defense

3   counsel, his expert, and the sentencing judge.  Petitioner has documentation to prove that he

4   was malnourished and emotionally neglected after being removed from his grandfather's

5   care, but those same documents report that he responded positively within weeks of the

6   removal and was "secure and happy" following adoption by the Moormanns (Dkt. 146, Exs.

7   27, 28).  *Cf. Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) (finding "of little value"

8   additional facts regarding petitioner's difficult childhood where evidence of childhood abuse

9   was presented at sentencing).  In sum, Petitioner has not proffered anything of significance

10  that was not already known or that would have been uncovered had counsel investigated and

11  presented evidence from other witnesses familiar with Petitioner's upbringing and

12  background.

13         While Petitioner has provided a more detailed description of his early life history that

14  perhaps paints a more sympathetic picture of him generally, it is clear that the sentencing

15  judge was aware of most of these facts and considered all of the written information

16  available, including the PSRs and mental health evaluations, as well as the testimony at trial.

17  Petitioner's extensive history of emotional, cognitive, and developmental difficulties was

18  well documented at trial, and the sentencing judge found as a mitigating factor that

19  Petitioner's ability to appreciate the consequences of his actions or to conform his conduct

20  to the law's requirements was significantly impaired.  A.R.S. § 13-703(G)(1).  The Court

21  concludes there is no reasonable probability that the additional background information

22  Petitioner has proffered would have affected the sentencing outcome.  Therefore, there is no

23  reasonable probability that the Arizona Supreme Court would have granted relief on this

24  claim had it been raised by counsel on direct appeal, and Petitioner has failed to establish

25  cause and prejudice to overcome its procedural default.

26                     **CERTIFICATE OF APPEALABILITY**

27         In the event Petitioner appeals from this Court's judgment, and in the interests of

28                                      - 56 -

1   conserving scarce Criminal Justice Act funds that might be consumed drafting an application

2   for a certificate of appealability (COA) to this Court, the Court on its own initiative has

3   evaluated the claims within the petition for suitability for the issuance of a certificate of

4   appealability.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

5       Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

6   is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

7   COA or state the reasons why such a certificate should not issue.  Pursuant to 28 U.S.C. §

8   2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of

9   the denial of a constitutional right."  This showing can be established by demonstrating that

10  "reasonable jurists could debate whether (or, for that matter, agree that) the petition should

11  have been resolved in a different manner" or that the issues were "adequate to deserve

12  encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

13  *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will

14  issue only if reasonable jurists could debate (1) whether the petition states a valid claim of

15  the denial of a constitutional right and (2) whether the court's procedural ruling was correct.

16  *Id.*

17      The Court finds that reasonable jurists could debate its resolution of the following

18  issues addressed in this Order: (1) whether appellate counsel rendered constitutionally

19  ineffective representation by failing to raise on direct appeal a claim alleging ineffective

20  assistance based on trial counsel's failure to pursue alternative defenses; (2) whether

21  appellate counsel rendered constitutionally ineffective representation by failing to raise on

22  direct appeal a claim alleging ineffective assistance based on trial counsel's waiver of lesser-

23  included-offense instructions; and (3) whether appellate counsel rendered constitutionally

24  ineffective representation by failing to raise on direct appeal a claim alleging ineffective

25  assistance based on sentencing counsel's failure to present lay witnesses concerning

26  Petitioner's background.  For the reasons stated in this Order, the Court declines to issue a

27  certificate of appealability with respect to the claim that appellate counsel rendered

28

constitutionally ineffective assistance when he failed to argue on appeal that the trial court erred in denying the defense an opportunity to rebut the state's evidence regarding insanity and to give the final closing argument.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Second Amended Petition for Writ of Habeas Corpus (Dkt. 118) is **DENIED**.   The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** on the following issues:

(1)   Whether appellate counsel rendered constitutionally ineffective representation by failing to raise on direct appeal a claim alleging ineffective assistance based on trial counsel's failure to pursue alternative defenses;

(2)   Whether appellate counsel rendered constitutionally ineffective representation by failing to raise on direct appeal a claim alleging ineffective assistance based on trial counsel's waiver of lesser-included-offense instructions; and

(3)   Whether appellate counsel rendered constitutionally ineffective representation by failing to raise on direct appeal a claim alleging ineffective assistance based on sentencing counsel's failure to present lay witnesses concerning Petitioner's background.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 7th day of July, 2008.

Roslyn O. Silver
United States District Judge

- 58 -